| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>NAZAR AL BUSSAM, ROSEMARY MENDOZA, and JAMES PARK | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br><br>10-   **10-2585M** |

Complaint for violation of Title 21, United States Code, Sections 846 and 841(a)(1), (b)(1)(C).

| NAME OF MAGISTRATE JUDGE<br><br>Honorable Fernando M. Olguin | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, CA |
|---|---|---|
| DATE OF OFFENSE<br><br>February 23, 2009 | PLACE OF OFFENSE<br><br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

   Beginning on a date unknown, and continuing to in or about October, 2010, in Los Angeles County, in the Central District of California, defendants NAZAR AL BUSSAM, Rosemary Mendoza, and James Park conspired to knowingly and intentionally distribute and dispense, and cause the intentional distribution and dispensing of, pills containing a detectable amount of Percoset, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Codes, Sections 846 and 841(a)(1), (b)(1)(C).  At all times relevant, NAZAR AL BUSSAM was a physician licensed to practice medicine in the State of California, acting and intending to act outside the usual course of professional practice and without a legitimate medical purpose.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
   (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>Kelly Webster |
|---|---|
| | OFFICIAL TITLE<br><br>SPECIAL AGENT -- Drug Enforcement Administration |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br><br>October 18, 2010 |
|---|---|

1)  See Federal Rules of Criminal Procedure rules 3 and 54.
NAT          REC: Detention

## A F F I D A V I T

I, Kelly Webster, hereby swear and affirm as follows:

## I.   INTRODUCTION

1.   I am an investigative officer of the United States within the meaning of Title 21 of the United States Code, and have been so employed as a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") since May 2003. I am assigned to the Los Angeles Field Division, currently tasked to investigate the illicit diversion of controlled substances by DEA registrants and non-registrants.  I have received specialized training concerning violations of the Controlled Substances Act, contained within Title 21 of the United States Code, while attending the DEA Training Academy in Quantico, Virginia.  I have worked in the DEA Tactical Diversion Squad investigating the diversion of controlled substances since October 2007 and have learned about the diversion of controlled substances, including the manner in which controlled substances are diverted, marketed, and consumed.  As a DEA Special Agent, I have become familiar with the manner in which controlled substances are distributed within legal and illicit markets, the methods of payment for such controlled substances, and the efforts involved in such activity to avoid detection by law

1

enforcement.  Additionally, I have participated in many aspects of pharmaceutical investigations and have been the lead investigator in numerous pharmaceutical investigations.

2.    Based on my training and experience, I am familiar with the methods used by pharmaceutical controlled substance diverters to conceal the nature of their illegal activity.  I have received training and have collaborated with other DEA SAs and Diversion Investigators ("DI"), as well as other law enforcement agencies, concerning investigations involving the unlawful possession and distribution of controlled substances.

## II.   PURPOSE OF AFFIDAVIT

3.    The investigation indicates that there is probable cause to believe that NAZAR AL BUSSAM, M.D. ("AL BUSSAM"), ROSEMARY MENDOZA ("MENDOZA"), and JAMES PARK ("PARK") have conspired to prescribe highly addictive prescription controlled substances, including oxycodone, Percoset, Dilaudid, hydrocodone, alprazalam, and promethozine with codeine (to include brand and generic names for the narcotics) without a legitimate medical purpose, from AL BUSSAM's two Los Angeles area medical offices, in violation of Title 21, United States Codes, Sections 846 and 841(a)(1).  Accordingly, this affidavit is made in support of the following:

2

a.   A complaint against, and warrant for the arrest of AL BUSSAM, MENDOZA, and PARK for conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1); and

b.   A search warrant to search AL BUSSAM's (1) Downey, California medical clinic; (2) Los Angeles, California medical clinic; (3) Newport Coast, California residence; and (4) three of his luxury automobiles, as more fully described below and in Attachments A(1), A(2), A(3), A(4), A(5), and A(6) for evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 846 and 841(a)(1).

4.   This affidavit is based on personal knowledge that I have gained from my participation in this investigation, as well as information from the following sources, among others:

a.   The oral and written reports and other supportive documentation about this investigation (and others), including undercover video surveillance, which I have received from other federal agents and other law enforcement agencies, both within and outside of California, as well as conversations with such law enforcement officers and agents;

b.   The written expert report of Shafi Khalid, M.D., a Board-certified physician and the Chief Executive Officer of

3

San Diego Pain Consultants, Inc., who reviewed multiple reports and undercover surveillance videos, and concluded that AL BUSSAM's prescribing of controlled substances represents an extreme departure in standard of care and was done with no legitimate medical purpose;

      c.    Physical surveillance conducted by federal agents or local law enforcement agencies that have been reported to me either directly or indirectly;

      d.    Information provided by pharmacists and other sources of information; and

      e.    Seizures of controlled substances by non-DEA agencies made in California and other states related to AL BUSSAM.

5.    This affidavit is intended to show that there is sufficient probable cause for the requested complaints, arrest warrants, and search warrants. This affidavit is not intended to be a complete statement of all known information of evidentiary value, and it does not purport to set forth all of my knowledge of, or investigation into, this matter.

///

///

4

### III.   PREMISES TO BE SEARCHED

6.   The premises to be searched (the "SUBJECT PREMISES")
are further described in Attachments A(1), A(2), A(3), A(4),
A(5), and A(6) are as follows:

a.   SUBJECT PREMISES-1: AL BUSSAM's medical office in
the Brookshire Medical Building, which is located at 11411
Brookshire Avenue, Suite #403, Downey, California.  AL BUSSAM
operates a "medical practice" at this location, which is where
the undercover DEA agents, task force officers ("TFO"), and the
California Medical Board ("MBC") investigators conducted a
majority of the controlled purchases of prescriptions written by
AL BUSSAM.[1]  A search warrant is sought for SUBJECT PREMISES-1.
See Attachment A(1) for a more detailed description of SUBJECT
PREMISES-1.

_____

[1] It should be noted that Suite #403 is the current office in
which AL BUSSAM operates.  During the initial undercover
meetings in January 2009 through July 2009, AL BUSSAM operated
out of the same building but was located within Suite #503.
Therefore, when referring to operations occurring before 2010,
SUBJECT PREMISES-1 will refer to the old suite out of which AL
BUSSAM operated, Suite #503.  When referring to operations in
2010, SUBJECT PREMISES-1 will refer to the current office out of
which AL BUSSAM operates, Suite #403.  By and through this
search warrant, I am requesting permission to search Suite #403,
not Suite #503.

5

b.   SUBJECT PREMISES-2: AL BUSSAM's medical office in the Beverly-Alvarado Medical Center, which is located at 2105 Beverly Boulevard, Suite #231, Los Angeles, California.  The medical office is located on the second floor and leased by RPM Management.  RPM management is owned by MENDOZA, which stands for her initials (i.e., "Rosemary P. Mendoza").  AL BUSSAM operates a "medical practice" at this location, which is where the undercover DEA agents and TFOs conducted one controlled purchase of prescriptions written by AL BUSSAM.  A search warrant is sought for SUBJECT PREMISES-2.  See Attachment A(2) for a more detailed description of SUBJECT PREMISES-2.

c.   SUBJECT PREMISES-3: AL BUSSAM's residence, located at 2 Harcourt, Newport Coast, California.  AL BUSSAM owns and lives in this residence.  See Attachment A(3) for a more detailed description of SUBJECT PREMISES-3.

d.   LEXUS-1, AUDI-2 and MERCEDES-3:  Vehicles known to be driven, owned or leased by AL BUSSAM or his wife, Nazhat Al Bussam, including:  (1) A 2007 Lexus 350 ES, California license plate 5YQS008 (registered owner: AL BUSSAM or Nazhat Al Bussam, at 2 Harcourt, Newport Coast, California), VIN #JTHBJ46G972103464 ("LEXUS-1"); (2) A 2010 Audi, California license plate 6KHF637 (leased vehicle, with AL BUSSAM or Nazhat Al Bussam as the leasees, at 2 Harcourt, Newport Coast,

California), VIN #WAUCKAFR5AA007988 ("AUDI-2"); and (3) A 1997

Mercedes Benz, California license plate 3TJF358 (registered

owner: AL BUSSAM or Nazhat Al Bussam, at 2 Harcourt, Newport

Coast, California), VIN #WDBJF55F9VJ034015 ("MERCEDES-3").  See

Attachments A(4), A(5), and A(6) for a more detailed description

of the vehicles.

IV.  <u>BACKGROUND RE PROBABLE CAUSE CONCERNING SEARCH AND SEIZURE</u>
     <u>OF EVIDENCE</u>

     7.  Based on my training, education, experience, and

discussions with other law enforcement officers, I know that:

     a.   Persons involved in drug trafficking and the

diversion of controlled substances, including medical

professionals and employees, frequently keep controlled

substances, proceeds of drug sales, records of drug

transactions, and other records within their residences and

businesses or within ready access, i.e., in their storage areas

and vehicles, and conceal such items from law enforcement

authorities.  The drugs/prescriptions may be distributed or

sold, but documentary records and ledgers remain.

     b.   Persons involved in drug trafficking and the

diversion of controlled substances, including medical

professionals and employees, often maintain large amounts of

currency in their residences and businesses, safe deposit boxes,

and storage areas in order to finance their ongoing illegal activities and other businesses, as well as use currency to pay bills, to acquire assets, and to make other purchases.

c.    Persons involved in drug trafficking and the diversion of controlled substances, including medical professionals and employees, often maintain drug transaction records, books, account ledgers, payments, or notes and other evidence of financial transactions relating to obtaining, transferring, and spending substantial sums of money which result from engaging in drug trafficking activities at or in residences, businesses, safe deposit boxes, vehicles, and storage areas of these persons.

d.    Persons involved in drug trafficking and the diversion of controlled substances, including medical professionals and employees, often retain personal and business notes, letters, and correspondence relating to their narcotics/prescription orders at their residences, businesses, safe deposit boxes, and in storage areas.

e.    Persons involved in drug trafficking and the diversion of controlled substances, including medical professionals and employees, frequently retain telephone and address books and appointment books identifying additional

8

individuals, including "patients," involved in illegal trafficking of controlled substances and telephone toll records. Additionally, these persons generally retain documents or records which establish control of their premises and registered vehicles, including utility bills, cancelled checks, envelopes and deeds, leases, and titles and vehicle registrations.

f.    Persons involved in drug trafficking and the diversion of controlled substances, including medical professionals and employees, commonly use telecommunication devices to further their illegal operations and communicate with associates, including telephones, mobile telephones, cellular telephones, and digital paging devices.

g.    Persons involved in drug trafficking and the diversion of controlled substances, including medical professionals and employees, often maintain firearms to protect the proceeds of their drug trafficking. For example, during a federal search warrant for evidence of drug trafficking executed at a doctor's residence in December 2006, DEA agents found numerous loaded handguns and a rifle in various rooms throughout the residence. When interviewed about the firearms, the doctor told DEA agents he also carried a gun with him in the trunk of his vehicle, especially if he was carrying a lot of cash home from work.

h.    Doctors and their employees routinely maintain patient files in their offices where patients are seen.  I also know that under California State Law, doctors are required to keep records of the controlled substance prescriptions they write and that doctors routinely keep these records at their offices where they see patients.  I also know that doctors and employees keep these types of patient records and controlled substance records on computers or in other electronic forms.

## V.    OVERVIEW OF THE LAW AND POLICY RE PRESCRIPTION MEDICATION

8.    Based on my training and experience, I know that the distribution of controlled substances must meet certain federal rules and regulations.  Specifically, I know the following:

a.    Title 21, United States Code, Section 812, establishes schedules for controlled substances that present a potential for abuse and the likelihood that abuse of the drug could lead to physical or psychological dependence on that drug. Such controlled substances are listed as Schedule I through Schedule V, depending on the level of potential for abuse, the current medical use, and the level of possible physical dependence.  Pharmaceuticals are listed as controlled substances, from Schedule II through Schedule V, because they are considered dangerous.  There are other drugs that are

10

available only by prescription but are not classified as controlled substances.

b.    Pursuant to Title 21, United States Code, Section 822, controlled substances may only be prescribed, dispensed, or distributed by those persons who are registered with the Attorney General of the United States to do so (with some exceptions, such as delivery persons). The authority to register persons has been delegated to the DEA by the Attorney General.

c.    Title 21, Code of Federal Regulations, Section 1306.4, sets forth the requirements for a valid prescription. It provides that a "prescription for a controlled substance to be effective must be issued for a _legitimate_ medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." (Emphasis Added).

d.    The Chief of Drug Operations of the DEA Office of Diversion Control, Washington, D.C., has stated that acting within the course of professional practice "includes having an

11

established doctor-patient relationship based upon a medical history, a physical exam and diagnosis." Title 21, United States Code, Section 841(a)(1) makes it an offense for any person to knowingly or intentionally distribute or dispense a controlled substance except as authorized by law.

e.    Based on my training, experience and conversations with other experienced SAs and DIs, I know that Title 21, United States Code, Section 841(a)(1) is violated when the physician's authority to prescribe controlled substances is being used not for the treatment of a patient, but for the purpose of assisting in the maintenance of a drug habit or of dispensing controlled substances for other than a legitimate medical purpose or is otherwise issued outside the bounds of the practice of medicine.

f.    The MBC formally adopted a policy statement entitled "Prescribing Controlled Substances for Pain." The MBC's guidelines for prescribing a controlled substance for pain states that a medical history and physical examination must be accomplished. This includes an assessment of the pain, physical and psychological function; a substance abuse history; history of prior pain treatment; an assessment of underlying or coexisting diseases and conditions; and documentation of the presence of a recorded indication for the use of a controlled

12

substance.   California Business and Professions Code, Section
2242, states that there must be a logical connection between the
medical diagnosis and the controlled substance prescribed:
"Prescribing, dispensing, or furnishing dangerous drugs as
defined in Section 4022 without a good faith prior examination
and medical indication therefore, constitutes unprofessional
conduct."  A good faith examination is defined as an honest
effort to prescribe for a patient's condition in accordance with
the standard of medical practice generally recognized and
accepted in the country.

   g.   California Business and Professions Code, Section
2241.5(f)(1)(3), Intractable Pain Treatment Act, states that
"This section shall not affect the power of the board to deny,
revoke, or suspend the license of any physician and surgeon who
does any of the following:  (1) Prescribes or administers a
controlled substance or treatment that is non-therapeutic in
nature or non-therapeutic in the manner the controlled substance
or treatment is administered or prescribed or is for a non-
therapeutic purpose in a non-therapeutic manner; (2) Writes
false or fictitious prescriptions for controlled substances
listed in the California Controlled Substances Act or scheduled
in the Federal Comprehensive Drug Abuse Prevention and Control
Act of 1970."

h.    Distribution of a scheduled controlled substance in violation of Title 21, United States Code, Section 841(a)(1) (often referred to as "diversion"), by a medical doctor occurs when a medical doctor knowingly or intentionally prescribes or dispenses a controlled substance, knowing the drugs were controlled, outside "the usual course of professional practice," namely, not for a legitimate medical purpose. See United States v. Moore, 423 U.S. 122 (1975). The U.S. Supreme Court has held squarely that physicians may be prosecuted under Section 841.

## VI.    THE CONTROLLED SUBSTANCES IN THIS INVESTIGATION

9.    The controlled substances involved in this investigation include the following:

a.    "Oxycodone" is a generic name for a narcotic analgesic classified under federal law as a Schedule II controlled substance. Oxycodone is also known by its brand name, OxyContin. Oxycodone, when legally prescribed for a legitimate medical purpose, is typically used for the relief of moderate to severe pain. Oxycodone is sometimes referred to as "synthetic heroin." An oxycodone prescription is generally issued for a modest number of pills to be taken over a short period of time. Oxycodone and OxyContin are formulated in several strengths between 10mg and 80mg per tablet. Oxycodone

14

can be habit-forming and is a commonly abused controlled substance that is diverted from legitimate medical channels. Oxycodone typically has a street value of $20 to $30 per 80mg tablet in the greater Los Angeles area.  Because of its brand name, OxyContin typically will bring a higher street value. Due to the recent media and law enforcement attention surrounding the abuse of OxyContin, several doctors, including AL BUSSAM, have tapered back on prescribing this highly addictive pain medication and have prescribed other Schedule II controlled substances for pain in its place.

b.   "Oxycodone/APAP" is a generic name for a narcotic analgesic classified under federal law as a Schedule II controlled substance (APAP is a medical abbreviation for acetaminophen, which is also known by the brand name Tylenol). Oxycodone/APAP is also known by the brand name, Percocet, as well as Percodan.  Oxycodone/APAP, when legally prescribed for a legitimate medical purpose, is typically used to control pain. Oxycodone/APAP and Percocet are formulated in oral tablet strengths of 2.5mg/325mg, 5mg/325mg, 7.5mg/325mg, 7.5mg/500mg, 10mg/325mg, and 10mg/650mg.  Oxycodone/APAP can be especially habit-forming.  It is a commonly abused controlled substance that is often diverted from legitimate medical channels. Oxycodone/APAP is diverted away from legitimate medical use to

15

be abused to obtain a similar "high" as one would get from heroin.  Oxycodone/APAP and Percocet typically have a street value of $3 to $5 per tablet in the greater Los Angeles area. However, based on my training and experience, I am aware of traffickers earning between $5 to $10 per tablet.

c.    "Hydromorphone" is a generic name for a narcotic analgesic classified under federal law as a Schedule II controlled substance.  Hydromorphone is also known by the brand name, Dilaudid.  Hydromorphone, when legally prescribed for a legitimate medical purpose, is typically used to control pain. Hydromorphone and Dilaudid are formulated in oral tablet strengths of 2mg, 4mg, and 8mg.  Hydromorphone can be especially habit-forming.  It is a commonly abused controlled substance that is often diverted from legitimate medical channels. Hydromorphone is diverted away from legitimate medical use to be abused to obtain a similar "high" as one would get from heroin. Hydromorphone and Dilaudid typically have a street value of $20 per tablet in the greater Los Angeles area.

d.    "Hydrocodone" (and variations of hydrocodone, such as hydrocodone/APAP) is a generic name for a narcotic analgesic classified under federal law as a Schedule III controlled substance.  Hydrocodone is also found in medications known by the brand names Vicodin, Norco, and Lortab.

16

Hydrocodone, when legally prescribed for a legitimate medical purpose, is typically used for the relief of mild to moderate pain. Accordingly, the prescription is generally for a modest number of pills to be taken over a short period of time. Hydrocodone is formulated in combinations of 5-10mg of hydrocodone and 325-750mg of acetaminophen. Hydrocodone can be habit-forming and is a commonly abused controlled substance that is diverted from legitimate medical channels. Hydrocodone typically has a street value of $3 per 10mg tablet in the greater Los Angeles area. Hydrocodone and other Schedule III controlled substances are often prescribed and are taken to relieve pain before stronger and more addictive Schedule II pain medications are used.

e.    "Alprazolam" is a generic name for a Schedule IV benzodiazepine prescription drug. Alprazolam is marketed under the brand name Xanax. When used for a legitimate medical purpose, it is used to treat such conditions as anxiety, depression, and panic disorder. Alprazolam comes in the following strengths: 0.25mg, 0.5mg, 1mg, and 2mg. Alprazolam is a commonly abused controlled substance that is diverted from legitimate medical channels. Alprazolam and Xanax typically have a street value of $2 to $4 per tablet in the greater Los Angeles area. Exceeding the recommended dose or taking this

17

medication for longer than prescribed may be habit-forming. Alprazolam and Xanax are often abused when mixed with Schedule II and III controlled substances and are often prescribed along with these pain medications.

    f. "Promethazine with codeine" is a generic name for an antihistamine and narcotic cough suppressant syrup classified under federal law as a Schedule V controlled substance. Promethazine with codeine is also known by the brand name, Phenergan with codeine. Promethazine with codeine, when legally prescribed for a legitimate medical purpose, is typically used to control upper respiratory conditions and suppress coughing. Promethazine with codeine and Phenergan with codeine are formulated in liquid suspension in concentration of 10mg of codeine per milliliter of promethazine. Using promethazine with codeine can be habit-forming and is a commonly abused controlled substance that is often diverted from legitimate medical channels. Promethazine with codeine is diverted away from legitimate medical use to be abused to obtain a similar "high" as one would get from heroin. Promethazine with codeine is often consumed alone, mixed in a drink, or taken along with other abused pharmaceuticals. Promethazine with codeine and Phenergan with codeine typically have a street value of $150-$200 per 16 ounce pint (473 mL) in the greater Los Angeles area.

However, based on my training and experience, I know that promethazine with codeine and Phenergan with codeine are highly trafficked from the Los Angeles, California, area to the Houston, Texas, area.  In Texas, promethazine with codeine and Phenergan with codeine typically have a street value of $300-$500 per 16 ounce pint.

g.   "Buprenorphine" is a generic name for an opioid medication classified under federal law as a Schedule III controlled substance.  Buprenorphine is also known by its brand names, Suboxone and Subutex.  Buprenorphine, when legally prescribed for a legitimate medical purpose, is typically used for the treatment of narcotic (opioid) dependence. Buprenorphine works by preventing withdrawal symptoms, since the buprenorphine is actually a type of narcotic (opioid) itself. It should be used as part of a complete narcotic dependence treatment plan.  Suboxone typically has a street value of $5 per 8mg tablet in the greater Los Angeles area.

h.   "Carisoprodol" is a generic name for a muscle relaxant prescription-only medication.  Carisoprodol is also known by the brand name, Soma.  Carisoprodol, when legally prescribed for a legitimate medical purpose, is typically used to relax muscles and to treat minor pain associated with muscle strains and injuries.  Carisoprodol and Soma are formulated in

19

oral tablets with a typical strength of 350mg. It is a commonly abused medication and is often diverted from legitimate medical channels to be abused in conjunction with narcotics and benzodiazepines as part of a common drug "cocktail." Carisoprodol and Soma typically have a street value of $1 to $3 per tablet in the greater Los Angeles area.

## VII. AL BUSSAM, MENDOZA, AND PARK'S BACKGROUNDS AND CRIMINAL HISTORIES

10. On January 4, 2010, Immigration and Customs Enforcement ("ICE") SA Thomas Kasper informed me that AL BUSSAM's place of birth is Iraq and he became a Naturalized United States citizen in September 2007. Also, on July 28, 2010, I learned from ICE SA Eric Cardiel that MENDOZA and PARK became Naturalized United States citizens in February 1977 and November 1985, respectively.

11. On June 18, 2010, I conducted a criminal history check of AL BUSSAM. According to my query, AL BUSSAM has not been arrested or convicted of a crime in the United States. Similarly, on July 28, 2010, I conducted a criminal history check of MENDOZA and PARK. According to my queries, neither MENDOZA nor PARK has been convicted of a crime in the United States. PARK, however, was arrested in 2000 for inflicting

corporal injury on a spouse, in violation of California Penal
Code § 273.5(A).

## VIII.   STATEMENT OF PROBABLE CAUSE

A.   Overview of Investigation

12.  AL BUSSAM is a medical doctor currently licensed by
the State of California, who currently maintains a DEA
registration.[2]   The evidence obtained in this investigation
indicates that from at least October 2007 to the present, AL
BUSSAM has prescribed large quantities of highly addictive
prescription controlled substances, including oxycodone,
hydromorphone, hydrocodone, alprazolam, and promethazine with
codeine (both in brand name and generic form), without a
legitimate medical purpose.  Similarly, the evidence obtained
during this investigation indicates that during that time period
for AL BUSSAM, and at least since June 2010 for MENDOZA and

---

[2]  A July 2010 query of DEA databases revealed that AL BUSSAM
maintains his DEA registration at SUBJECT PREMISES-1.  AL BUSSAM
has not yet notified DEA concerning his new medical office at
SUBJECT PREMISES-2.

Additionally, according to the California Department of Health
and Human Services, AL BUSSAM is board certified in geriatrics.
However, according to the American Board of Medical Specialty,
his board certification could not be verified.  According to the
sign on his business at SUBJECT PREMISES-1, AL BUSSAM practices
in medical oncology, hematology, internal medicine, and
disability analysis.

PARK, AL BUSSAM, MENDOZA, and PARK conspired to sell prescriptions for those drugs, among other drugs, without a legitimate medical purpose.

13. As described below, based on evidence obtained during this investigation, including: (1) Information from CURES Reports[3] (paragraphs 17 to 23, herein); (2) Interviews and information obtained from former and current patients (paragraphs 24 to 25, herein); (3) Interviews with pharmacists (paragraphs 26 to 28, herein); (4) Recorded undercover operations by DEA SAs, DEA TFOs, and MBC investigators (paragraphs 29 to 45, herein); (5) Out-of-state drug seizures and arrests relating to AL BUSSAM (paragraphs 46 to 49, herein); and (6) An expert opinion of Dr. Khalid, an established physician in the field of pain management (paragraphs 50 to 62, herein); as well as other facts in this affidavit, there is probable cause to believe that AL BUSSAM, MENDOZA, and PARK have conspired to prescribe highly addictive prescription controlled substances to patients without a legitimate medical purpose, from SUBJECT PREMISES-1 and SUBJECT PREMISES -2, in violation of Title 21, United States Codes, Sections 846 and 841(a)(1).

---

[3] As explained below, in paragraph 15(a), a "CURES Report" is a report generated by the California Department of Justice, Bureau of Narcotic Enforcement, which can be used to track a doctor's or patients' prescriptions.

B.   Initiation of Investigation Based on AL BUSSAM's
     Prescribing History

     14.   In October 2007, an investigation was initiated based

on DEA database information indicating that AL BUSSAM was among

the top 10 prescribers of controlled substances in the Los

Angeles area.   That information was derived from a database used

by DEA and comprised of information from DEA registrants (i.e.,

doctors) concerning the volume of prescriptions that each

respective registrant wrote.   DEA no longer uses this database

and, therefore, AL BUSSAM's current prescriber-ranking is

unavailable.

     15.   Based on the database information, DEA SA Mary

Strapple ("SA Strapple") and DEA DI Susannah Herkert ("DI

Herkert") conducted a query of AL BUSSAM's prescribing history

with the California Department of Justice, Bureau of Narcotic

Enforcement ("BNE"), Controlled Substance Utilization Review and

Evaluation System ("CURES") program.   Based on my training and

experience, I know the following:

     a.   A "CURES Report" is a report generated by BNE,

which can be used to track a doctor's or patients'

prescriptions.   The CURES maintains Schedule II, Schedule III,

Schedule IV, and sometimes Schedule V prescription information

that is received from California pharmacies.   Pharmacies in

California are required to report prescriptions filled for Schedule II, Schedule III, and Schedule IV controlled substances.  Pharmacies are not required to report prescriptions filled for Schedule V controlled substances.  However, some pharmacies do report Schedule V prescriptions to BNE, therefore, Schedule V controlled substances may or may not appear on a CURES report.

b.    Additionally, although pharmacies are required to report prescriptions filled for Schedule II through Schedule IV controlled substances to BNE, the information in a CURES report is only as accurate as the information provided to BNE by the pharmacies.  If a patient receives a prescription that is never filled, it will not be reflected on a CURES report.

16.  SA Strapple and DI Herkert's 2007 CURES query, as well as later CURES queries by me, reflect patterns described in detail below that, based on my training and experience and the training and experience of other SAs and DIs investigating diversion of controlled substances, indicate AL BUSSAM is engaged in unlawful dispensing of prescriptions of controlled substances and assisting in the maintenance of his "patients'" drug habits.

///

C.   General CURES Information Concerning AL BUSSAM

17.   Since taking over the case in late 2008, I queried and reviewed various CURES reports.   From reviewing the CURES reports throughout this investigation, I have learned the following about patients of AL BUSSAM:

a.   Many patients fill prescriptions before 30 days have passed since their last prescription from AL BUSSAM and, therefore, obtain large quantities of prescription controlled substances.   Excessive quantities of filled prescriptions often indicate addiction to or diversion of pharmaceuticals.

b.   Multiple patients practice "doctor shopping" in that they frequent multiple doctors to obtain larger quantities of the controlled substances they seek, whether it be for addiction and individual consumption, or for those who are diverting the substances for illegal street sales.

c.   Patients that fill multiple prescriptions within a 30-day period often go to different pharmacies, most likely, to avoid suspicion.   This is referred to as "pharmacy shopping" and it is done to avoid suspicion by the pharmacist because of the quantity of medication sought within such a short time frame.

25

d.    Often, doctors who prescribe controlled substances such as addictive medications in a legitimate manner utilize the CURES reports on their own patients to ensure that those patients are also not obtaining pain medications from other doctors.  Based on AL BUSSAM's prescribing history, it does not appear he reviews CURES for his patients before prescribing controlled substances.  If AL BUSSAM does run CURES, his prescribing history indicates that he ignores it.

e.    Several of AL BUSSAM's patients combine doctor shopping with pharmacy shopping to avoid suspicion or detection by the pharmacists.

f.    Several of the pharmacies that AL BUSSAM's patients frequent are not major national "chain" pharmacies, such as CVS, Walgreens, Rite Aid, etc.  Instead, AL BUSSAM's patients often use independent pharmacies to fill their prescriptions.  Some of these pharmacies are being independently investigated by DEA.  "Pharmacy Shoppers" often use a combination of "chain" and independent pharmacies to avoid detection.

g.    According to the CURES reports, some of AL BUSSAM's patients utilize multiple spellings of either their first and/or last names and are therefore able to obtain more

26

controlled substances.  Also, the prescriptions under one name are usually not filled at the same pharmacy as the prescriptions using a different spelling of that name.  Since AL BUSSAM signs each of the prescriptions issued, AL BUSSAM, MENDOZA, and PARK may be aware that "patients" obtain these prescriptions under multiple versions of the same name.

h.   Several patients receive either a Schedule II or III pain medication, along with a Schedule IV or V controlled substance, on the same prescription.  For instance, many of AL BUSSAM's patients receive hydrocodone along with alprazolam or promethazine with codeine.  The "mixing" of various controlled substances on a single prescription, when done in excess, is sometimes referred to by law enforcement as "cocktail" prescriptions.  The use of more than one controlled substance further increases a user's "high," which is why the prescription "cocktail" is taken.

i.   Although Schedule V controlled substances do not have to be reported by the pharmacies to BNE and, therefore, most CURES reports do not contain entries of promethazine with codeine or Phenergen with codeine, several patients of AL BUSSAM have filled prescriptions with these medications that have been seized in other states.

D.    CURES Information Concerning AL BUSSAM's Volume of
      Prescriptions

18.   From my review of a CURES report between April 1, 2008
and April 30, 2010, I estimated the following quantities of
filled individual prescriptions of controlled substances written
by AL BUSSAM:

      a.    Approximately 36,495 hydrocodone prescriptions,
in various strengths, quantities, and brand-versus-generic
combinations.

      b.    Approximately 15,652 alprazolam prescriptions, in
various strengths, quantities, and brand-versus-generic
combinations.

      c.    Approximately 3,590 oxycodone prescriptions, in
various strengths, quantities, and brand-versus-generic
combinations.

      d.    Approximately 3,040 hydromorphone prescriptions,
in various strengths, quantities, and brand-versus-generic
combinations.

      e.    Based on my training and experience, as well as
my conversations with Dr. Khalid, I believe that this volume of
prescriptions is excessive for similar doctors with similar
practices, and therefore indicates that AL BUSSAM, MENDOZA, and

28

PARK are involved in the illegal distribution of prescriptions without medical necessity.

E.   The April 2010 CURES Information

19.   As part of my investigation, I ran a CURES report for April 2010.  Based on my review of that report, I learned that most of the prescriptions written by AL BUSSAM were for hydrocodone and alprazolam.

20.   For instance, one patient, KB, who was identified during this investigation as a potential "pharmacy shopper," received and filled multiple prescriptions from AL BUSSAM during a 30-day time period in April 2010.  He filled the following prescriptions on the following days: (a) 90 Xanax tablets at a Sav-On on April 1, 2010; (b) 150 Norco tablets at a Sav-On on April 1, 2010; (c) 100 alprazolam tablets at a Costco Pharmacy on April 5, 2010; (d) 120 hydrocodone tablets at a Costco Pharmacy on April 5, 2010; (e) 150 hydrocodone tablets at a Rite Aid on April 8, 2010; (f) 100 alprazolam tablets at a Walmart on April 13, 2010; (g) 120 hydrocodone tablets at a Walmart on April 13, 2010; (h) 120 hydrocodone tablets at a Super RX Pharmacy on April 14, 2010; (i) 100 alprazolam tablets at a Super RX Pharmacy on April 15, 2010; (j) 120 hydrocodone tablets at a Pavilions Pharmacy on April 19, 2010; (k) 100 hydrocodone

tablets at a CVS Pharmacy on April 21, 2010; (l) 120 hydrocodone tablets at a Downey Plaza Pharmacy on April 22, 2010; (m) 120 hydrocodone tablets at a Target Store on April 24, 2010; (n) 100 alprazolam tablets at a Target Store on April 28, 2010; and (o) 150 Norco tablets at a Sav-On on April 29, 2010.

21. As reflected above, within a 30-day period, KB filled AL BUSSAM's prescriptions on consecutive days at different pharmacies and received approximately 1,270 tablets of a Schedule III controlled substance (hydrocodone/Norco) and approximately 490 tablets of a Schedule IV controlled substance (alprazolam/Xanax), which are all commonly diverted narcotics. Based on my conversations with Dr. Khalid, I understand that this number of tablets prescribed within a 30-day time period is extremely excessive.

22. The number of Schedule III controlled substances that KB received break down to approximately 42 tablets per day, which I know to be an excessive amount for personal use and, therefore, I believe most, if not all, of these drugs were diverted.

23. KB resides in or around Santa Clarita, California, which is approximately 48 miles from SUBJECT PREMISES-1. That distance indicates to me that KB is visiting AL BUSSAM because

he knows that AL BUSSAM will illegally prescribe him controlled substances without medical necessity, which a legitimate practitioner would not do.

F.   Interview of former AL BUSSAM patient on May 27, 2010

24.   On May 27, 2010, DI Spencer Shelton ("DI Shelton") and I interviewed SR, a former patient of AL BUSSAM, at her residence in Acton, California.  During the interview, I learned the following:  (a) Even though she lived more than 60 miles away from SUBJECT PREMISES-1, SR visited AL BUSSAM at SUBJECT PREMISES-1 to obtain prescriptions for over five years because she was addicted to hydrocodone; (b) AL BUSSAM would see approximately 50 patients in only a few hours time; (c) Patients paid approximately $70 to $100 in cash for an office visit, which included one prescription; (d) If a patient requested a refill prescription, AL BUSSAM would charge an extra $50; (e) AL BUSSAM's other patients told SR about his "other" office, SUBJECT PREMISES-2, previously located at 3919 Beverly Boulevard, Suite #203, Los Angeles, but SR never visited SUBJECT PREMISES-2; (f) The previous location of SUBJECT PREMISES-2 did not even have an examination room, according to other patients; and (g) After SR realized she was addicted, she requested and began taking a prescription for Suboxone.  She stopped seeing AL BUSSAM shortly thereafter.

31

25.   Based on a query of a CURES report from June 2008 to January 2009, SR filled a total of approximately 10,680 tablets of hydrocodone, which is an average of 1,335 tablets per month. Based on my training and experience, I know that an average of 1,335 tablets per month is excessive.   I also know that if AL BUSSAM were operating legitimately, he should not have written that amount of controlled substance prescriptions to one patient.

G.   Interviews of Pharmacists Concerning AL BUSSAM's Patients and Prescriptions

26.   Throughout the investigation of AL BUSSAM, multiple pharmacies have contacted DEA regarding AL BUSSAM's unusual and suspicious prescribing practices.   During the investigation, I have conducted multiple interviews with these pharmacists.

27.   Specifically, I interviewed the following pharmacists on the following dates: (a) Costco Pharmacist ("KT") in Fullerton, California, on December 8, 2008; (b) Longs Drugs Pharmacist ("KD") in Downey, California, on December 8, 2008; (c) Ralph's Pharmacist ("OK") in Studio City, California, on December 11, 2008 and April 12, 2010; (d) Walgreens Pharmacist ("EK") in Norwalk, California, on August 27, 2009; and (e) Walgreens Pharmacist ("AF") in Pico Rivera, California, on November 3, 2009.

28.   Based on conversations with some of these pharmacists, and on my training and experience, I know the following facts:

a.   AL BUSSAM's patients travel a long distance, often in groups, to obtain and fill prescriptions for controlled substances.  For instance, Longs Drugs Pharmacist KD reported that one patient traveled 83 miles from her residence in Hemet, California to obtain a prescription from AL BUSSAM at SUBJECT PREMISES-1.

b.   Multiple patients will present prescriptions from AL BUSSAM for the same narcotics at the same pharmacy at the same time.

c.   AL BUSSAM's "patients" are sometimes "patients" of other doctors and, therefore, practice "doctor shopping" by filling multiple prescriptions for the same or similar controlled substances.

d.   AL BUSSAM's "patients" often "pharmacy shop" by frequenting multiple pharmacies to fill multiple prescriptions from either AL BUSSAM or other doctors within a short time period.

e.   AL BUSSAM's patients often have multiple controlled substances prescribed on one prescription, often for

33

unrelated issues.  For instance, AL BUSSAM has prescribed a "cocktail" of Schedule II pain medications, with Schedule IV anti-anxiety medications, and Schedule V respiratory medications.

f.   When AL BUSSAM's patients attempt to fill their prescriptions with multiple medications on the same prescription, they often refuse to fill the medications for non-controlled substances.  For example, Ralph's Pharmacist OK complained that patients would not fill antibiotics such as Amoxicillin and Keflex, and hypertension medications such as Lotrel, but would fill only the controlled substances, such as promethazine with codeine.

H.   Undercover Investigation Concerning AL BUSSAM, MENDOZA, and PARK from January 2009 to July 2010

29.  Based on the above information concerning AL BUSSAM, DEA directed a series of controlled substance purchases in which an undercover DEA agent and MBC investigator purchased multiple prescriptions for various controlled substances from AL BUSSAM for cash at SUBJECT PREMISES-1, as well as one undercover operation by an undercover DEA TFO at SUBJECT PREMISES-2. During each undercover operation, the agent/investigator/TFO paid AL BUSSAM's office $100 cash for each prescription, with the initial visit costing $200 cash at SUBJECT PREMISES-1 and

34

$370 at SUBJECT PREMISES-2.   During this investigation, there

were a total of eight undercover operations, each of which is

described herein.

### Undercover Purchase of Prescription for Vicodin ES Tablets on January 26, 2009

30.   On January 26, 2009, DEA SA Christopher Johnson ("SA

Johnson"), acting in an undercover capacity as a "patient," went

to SUBJECT PREMISES-1 (Suite #503) to purchase a prescription of

OxyContin from AL BUSSAM.   SA Johnson did not schedule an

appointment but walked into the office as a "new patient."

During the operation, SA Johnson was wearing a recording device.

As detailed below, SA Johnson received a prescription for 150

Vicodin ES tablets with no medical necessity or examination.

After reading SA Johnson's report of the undercover buy,

watching the undercover video recording of the purchase, and

speaking with SA Johnson, I learned the following:

a.   On January 26, 2009, at approximately 10:07 a.m.,

SA Johnson entered the building where SUBJECT PREMISES-1 is

located.   SA Johnson waited in the hallway with approximately

six other patients, as the office staff had not yet arrived.

b.   At approximately 11:45 a.m., Ricardo Moran

("Moran") arrived, followed shortly after by AL BUSSAM.   Moran

is one of AL BUSSAM's employees at SUBJECT PREMISES-1.   SA

35

Johnson signed in using his undercover name "Christopher Washington." SA Johnson then took a seat in the waiting room. Approximately 15 minutes later, Moran requested he fill out paperwork, to include patient medical history forms. SA Johnson did not recall being required to fill out any type of pain assessment form.

c. While waiting approximately three hours to be seen, SA Johnson observed numerous patients in the waiting room. SA Johnson informed me that the waiting room held approximately 15 people and was full. When observing patients in SUBJECT PREMISES-1, SA Johnson noticed that many left with prescriptions in their hands. SA Johnson also informed me that he would see groups of people (i.e., two or more) arrive at AL BUSSAM's office together.

d. At approximately 1:00 p.m., Moran called SA Johnson's name and asked for his identification, and SA Johnson provided him with a copy of his undercover California Driver's License. Moran made a copy of it and told SA Johnson the visit would cost $200. SA Johnson gave him $200 in cash in the form of Official Advance Funds ("OAF").

e. At approximately 1:15 p.m., Moran took SA Johnson's height and weight. He then walked SA Johnson into an

36

examination room where he took his blood pressure and told SA

Johnson to wait for AL BUSSAM.

      f.   At approximately 1:27 p.m., AL BUSSAM arrived in

the examination room and introduced himself to SA Johnson.  As

he spoke with SA Johnson, he wrote in what appeared to be SA

Johnson's medical file.  AL BUSSAM asked SA Johnson why he was

there, but before SA Johnson answered, AL BUSSAM offered the

reason "backache."  SA Johnson agreed, but told AL BUSSAM that

"it" (i.e., the "backache") was a couple of years ago.

      g.   AL BUSSAM immediately went on to discuss what, if

any, controlled substances SA Johnson took in the past. SA

Johnson responded "OxyContin" and asked for more of that

narcotic.

      h.  AL BUSSAM responded by stating that he did not

prescribe "Oxy" because of the "controversy" surrounding it, and

that he did not want to "get involved with it."  AL BUSSAM told

SA Johnson he could get Vicodin and asked what strength he

wanted, and proceeded to explain the different types to him.  SA

Johnson agreed that the Vicodin Extra Strength ("ES") AL BUSSAM

suggested was okay.

      i.  AL BUSSAM then discussed SA Johnson's purported

"backache" with SA Johnson.  SA Johnson stated that it was not

his back but his feet, and that his injury occurred a long time ago.

  j. AL BUSSAM asked SA Johnson about Soma and Xanax. AL BUSSAM inquired whether or not SA Johnson was taking or wanted these medications.  SA Johnson said "no."

  k. AL BUSSAM proceeded to ask SA Johnson demographical information while he wrote in his chart.  AL BUSSAM also briefly monitored SA Johnson's heart and lungs. This is the only time AL BUSSAM physically touched SA Johnson during this visit.

  l. After asking SA Johnson what pharmacy he goes to, AL BUSSAM informed SA Johnson that he had already signed a contract (i.e., believed to be a medical waiver form) that allowed AL BUSSAM to give SA Johnson medications on a regular basis.

  m. AL BUSSAM informed SA Johnson that he needed 150 tablets of Vicodin every month.  SA Johnson asked if he would be able to get more than 150 tablets per month, to which AL BUSSAM replied "no."  Shortly thereafter, AL BUSSAM gave SA Johnson the prescription, told him to take one tablet every four hours, and that he would see SA Johnson in a month.  The undercover meeting with AL BUSSAM concluded.

n.   Once SA Johnson received the prescription, he exited the examination room and made an appointment with Moran to come back in a month.  While SA Johnson was making an appointment, he asked Moran if he could get some other "stuff" if he paid extra money, and Moran said that it depends on what SA Johnson requested.  Moran said that SA Johnson did not have to pay more for certain prescriptions, but did for cough syrup and refills.

o.   At approximately 1:40 p.m., SA Johnson exited the medical building and the undercover operation was terminated. He later gave me the prescription for Vicodin ES and the concealed recording device.

31.  After discussing the meeting with SA Johnson, and reviewing the recording, as well as reviewing Dr. Khalid's expert report, I believe that AL BUSSAM prescribed Vicodin ES to SA Johnson without medical necessity and, therefore, beyond legitimate medical practice.  Based on my training and experience, I believe that due to the following:

a.   In the waiting room of SUBJECT PREMISES-1, SA Johnson observed groups of people arriving at SUBJECT PREMISES-1 together.  Based on my training and experience with diverted pharmaceuticals, this behavior occurs because those referred to

39

as "recruiters" often take groups of people to a doctor, and then to a pharmacy to have the prescription filled. Once filled, the recruiters buy the prescription from the recruited "patient." Although it is common for an individual patient to bring a family member or friend to the doctor with him/her, it is uncommon for the average patient to visit a doctor in a group.

b. SA Johnson did not receive a physical examination other than his vitals being taken. After waiting three hours, his visit was only approximately 10 minutes long, and much of that time was spent in silence while AL BUSSAM wrote in SA Johnson's medical chart.

c. AL BUSSAM did not allow SA Johnson to answer in his own words as to why he was at the office. When SA Johnson first mentioned pain medications he had been previously prescribed at the beginning of the visit, AL BUSSAM asked why SA Johnson received medication. Before he had time to answer, AL BUSSAM offered "backache" as an answer. As heard on the recording, when SA Johnson mumbled, "umm, yeah, it was like a couple of years ago," AL BUSSAM continued to talk about this supposed "backache." I believe that a review of AL BUSSAM's notes in SA Johnson's "medical file" will reflect this fictional "backache" as SA Johnson's reason to be seen.

40

d.    AL BUSSAM also discussed what he would prescribe SA Johnson.  Once it was clear he would not prescribe OxyContin because of the "controversy" surrounding the drug (e.g., possibly the recent criminal prosecutions by DEA of other physicians that have prescribed the drug without medical necessity, and the drug being highly addictive and often trafficked by narcotics dealers because of street-level demand), AL BUSSAM told SA Johnson what type of Vicodin he would give him.  SA Johnson and AL BUSSAM agreed that AL BUSSAM would prescribe that medication before discussing SA Johnson's "pain" more thoroughly.

e.    Although SA Johnson, in response to AL BUSSAM's cue, mentioned his past back or feet pain, AL BUSSAM did not physically touch SA Johnson's back or feet.  In fact, AL BUSSAM only touched SA Johnson to monitor his heart and lungs.  Further, it was unclear what injury SA Johnson was asking to alleviate by his visit.  Even after SA Johnson spoke of an "injury" that occurred a "couple of years ago," he specifically told AL BUSSAM he "did not have anything now."  AL BUSSAM never asked SA Johnson to clarify the place and time of his injury.

f.    AL BUSSAM never manipulated SA Johnson's body in various positions.  He did not ask about what steps SA Johnson had taken to alleviate "pain," how severe his pain is/was (pain

41

scale/threshold), if he ever participated in physical therapy, etc. Therefore, I believe AL BUSSAM prescribed pain medication to SA Johnson without taking steps to establish a legitimate medical purpose for the prescription.

g. AL BUSSAM suggested other medications to SA Johnson to be used with the Vicodin ES, namely, a muscle relaxer and an anti-anxiety medication. Even though SA Johnson responded negatively, when AL BUSSAM asked if he wanted Soma and/or Xanax, AL BUSSAM appeared to push the medications on SA Johnson by specifically telling him "[Soma's] not dangerous; it's a muscle relaxant. . .." Asking SA Johnson if he wanted the prescription cocktail of anti-anxiety medication and/or a muscle relaxer is also alarming, not only because SA Johnson did not ask for them, but also because he never gave AL BUSSAM any indication he needed them.

h. During the visit, AL BUSSAM asked SA Johnson questions about his occupation, and whether he drank/smoked, was married, etc., while he wrote in SA Johnson's chart. I believe AL BUSSAM asked these questions in order to "legitimize" SA Johnson's chart.

i. Before he left, SA Johnson asked Moran if he could get some other "stuff" if he gave AL BUSSAM extra money.

42

Moran did not appear alarmed by SA Johnson's question. Instead, Moran told SA Johnson that it depended on what he requested. I believe a nurse/physician's assistant at a legitimate medical practice would have been alarmed at this question and would have probably confronted SA Johnson about it. Moran's acted as if SA Johnson's question was legitimate and normal.

        j.    Moran also told SA Johnson that if he wanted cough syrup or refills, that would cost extra money. Based on my experience, I understand that legitimate medical practices do not charge patients an extra fee for necessary and needed medication.

### Undercover Purchase of Prescription for Percoset and Xanax Tablets on February 23, 2009

    32.    On February 23, 2009, SA Johnson went into SUBJECT PREMISES-1 in an undercover capacity. SA Johnson wore a recording device. As detailed below, SA Johnson met with AL BUSSAM and received a prescription for 150 Percoset 10/325mg tablets and 100 Xanax 2mg tablets with no medical necessity or examination. After reading SA Johnson's report of the undercover buy, watching the undercover recording of the purchase, and speaking with SA Johnson, I learned the following:

a.    On February 23, 2009, at approximately 11:55 a.m., SA Johnson entered the building where SUBJECT PREMISES-1 is located.

b.    When SA Johnson arrived at SUBJECT PREMISES-1, he signed in and noticed that the waiting room was full (i.e., approximately 15 people).  Also, like his last visit, people arrived in groups of two or more.

c.    At approximately 1:15 p.m., SA Johnson was called to the receptionist desk by Moran.  Moran told SA Johnson that the office visit fee was $100.  SA Johnson gave Moran $100 OAF.

d.    At approximately 1:25 p.m., Lucy Ochoa ("Ochoa"), an office employee, took SA Johnson's vitals and placed him into an examination room.

e.    At approximately 1:35 p.m., AL BUSSAM entered the examination room and asked SA Johnson what he wanted.  SA Johnson asked AL BUSSAM if he could get OxyContin and AL BUSSAM told SA Johnson that he does not give "Oxy."  SA Johnson asked AL BUSSAM for Percoset.  AL BUSSAM asked SA Johnson if a dosage of "10 over 325" was okay, to which SA Johnson replied in the affirmative.  AL BUSSAM also asked SA Johnson if he wanted a prescription for Xanax.  SA Johnson said that was fine as well.

44

  f. AL BUSSAM wrote out the prescription, gave it to SA Johnson, and told SA Johnson he would see him in a month. The meeting with AL BUSSAM in the examination room lasted less than two minutes.

  g. At approximately 1:45 p.m., SA Johnson exited the building and the undercover operation terminated.  He later gave me the prescription for Percoset and Xanax and the concealed recording device.

33. After discussing the meeting with SA Johnson, and reviewing the recording, as well as reviewing Dr. Khalid's expert report, I believe that AL BUSSAM wrote the prescriptions to SA Johnson without medical necessity and, therefore, beyond legitimate medical practice.  Based on my training and experience, I believe that due to the following:

  a. AL BUSSAM met with SA Johnson for less than two minutes, a majority of which AL BUSSAM was silently writing in SA Johnson's medical chart.  SA Johnson was not given a physical examination in SUBJECT PREMISES-1.

  b. AL BUSSAM did not discuss SA Johnson's pain during his "examination" of SA Johnson.  Instead, AL BUSSAM's "examination" of SA Johnson began by immediately asking SA Johnson which prescription he wanted.

c.   AL BUSSAM volunteered to give SA Johnson Xanax even though SA Johnson specifically refused Xanax during his first visit to SUBJECT PREMISES-1, and had not exhibited any signs of anxiety.

d.   Although AL BUSSAM would not prescribe SA Johnson OxyContin, AL BUSSAM increased the strength of SA Johnson's prescription from Vicodin ES (a Schedule III controlled substance) to Percoset (a Schedule II controlled substance) from his first visit to his second visit.  Based on my training and experience, it would be unusual for a doctor to prescribe a stronger, more addictive pain medication, like Percoset, without once asking any questions about that patient's pain.  However, AL BUSSAM did exactly that with SA Johnson.

<u>Undercover Purchase of Prescription for Percoset, Xanax, and Soma Tablets on April 20 and May 27, 2009</u>

34.   On April 20, 2009 and May 27, 2009, SA Johnson went into SUBJECT PREMISES-1 in an undercover capacity.  During each of these visits, SA Johnson wore a recording device, and met with AL BUSSAM.  During both visits, AL BUSSAM's "examination" of SA Johnson lasted less than three minutes.  AL BUSSAM immediately asked SA Johnson what prescription he wanted, without asking about pain, and spent most of his "examination" of SA Johnson silently writing in SA Johnson's medical chart.

46

On April 20, 2009, SA Johnson received a prescription for 150 Percoset 10/325mg tablets and 100 Xanax 2mg tablets with no medical necessity or examination.   On May 27, 2009, SA Johnson received a prescription for 150 Percoset 10/325mg tablets, 100 Xanax 2mg tablets, and 100 Soma 350mg tablets with no medical necessity or examination.

### Undercover Purchase of Prescription for Percoset, Xanax, and Soma Tablets on June 4, 2009

35.   On June 1, 2009, MBC Investigator Carlos Rodriguez ("Inv. Rodriquez") went into SUBJECT PREMISES-1 in an undercover capacity in order to obtain a prescription for controlled substances from AL BUSSAM without necessity.   Inv. Rodriguez wore a recording device.   Inv. Rodriguez was unable to meet with AL BUSSAM at that time, so he scheduled an appointment for June 4, 2009 at 2:00 p.m.

36.   On June 4, 2009, Inv. Rodriguez returned to SUBJECT PREMISES-1.   Inv. Rodriguez wore a recording device.   As detailed below, Inv. Rodriguez met with AL BUSSAM and received a prescription for 150 Percoset 10/325mg tablets, 100 Xanax 2mg tablets, and 100 Soma 350mg tablets with no medical necessity or examination.   After reading Inv. Rodriguez's report of the undercover buy, reviewing the recording, and speaking with Inv. Rodriguez, I learned the following:

a.   At approximately 2:19 p.m., Inv. Rodriguez walked into the medical building.  Inv. Rodriguez then walked up to the counter at SUBJECT PREMISES-1 and told Ochoa that he had an appointment.  Ochoa asked Inv. Rodriguez if he was "Angel Balboa" (Inv. Rodriguez's undercover name), to which he responded affirmatively.

b.   Ochoa searched through what looked to be patient charts and pulled out a folder.  She gave Inv. Rodriguez forms to fill out.  Inv. Rodriguez does not recall whether he filled out a pain assessment form.  However, like SA Johnson, he did remember signing a liability-type form about pain medication and addiction, and a general question about ailments on the medical history form, but nothing asking him to rate his pain, etc.

c.   Ochoa told Inv. Rodriguez the initial visit would cost $200 and the follow-up visits would cost $100.  She then asked Inv. Rodriguez if he would be getting "cough syrup," to which Inv. Rodriguez replied "No."  Ochoa made a copy of Inv. Rodriguez's undercover California Driver's License.

d.   Later, Inv. Rodriguez was asked to pay the receptionist $200 for the visit.  Subsequently, his vitals were taken and he was placed into an examination room.

e.   In the examination room, Moran asked routine medical background questions (i.e., allergies, current medications, smoking and drinking habits, etc.).  After noting the answers in Inv. Rodriquez's chart, Moran left the examination room.

f.   Shortly thereafter, AL BUSSAM came into the examination room.  He looked at Inv. Rodriquez's chart and asked why he was there.  Inv. Rodriquez stated that his friend "Chris" (i.e., SA Johnson) recommended him and that "Chris" indicated AL BUSSAM could give him some prescriptions, such as OxyContin.  AL BUSSAM asked Inv. Rodriquez what was wrong with him, and asked if he had pain.  Inv. Rodriquez responded "No, not really."

g.   AL BUSSAM asked Inv. Rodriquez what prescription medications he normally takes, and Inv. Rodriquez replied that he used to take OxyContin.  Inv. Rodriquez explained that he just moved back to California from Texas, where a doctor there gave him OxyContin.

h.   AL BUSSAM stated that he does not write OxyContin prescriptions.  AL BUSSAM asked Inv. Rodriquez if he would be interested in Norco or Vicodin, and then stated "we will give you those."

49

i.    Inv. Rodriguez asked about receiving a prescription for Dilaudid, to which AL BUSSAM responded that he could give Dilaudid but needed to know what Inv. Rodriguez's reason was. Inv. Rodriquez responded that "it will help you relax." AL BUSSAM asked if he was a habitual user. Inv. Rodriguez said that it makes him feel good. AL BUSSAM laughed and stated, "Yeah, everybody tells me the same thing, you know?"

j.    AL BUSSAM continued to talk about Dilaudid with Inv. Rodriguez. Specifically, AL BUSSAM stated that before writing a prescription, he needed a reason to prescribe that drug. He offered various potential reasons for writing a prescription for Dilaudid to Inv. Rodriguez, including a backache, a back injury, or body injury. In response, Inv. Rodriguez asked AL BUSSAM "what would be a good reason?" AL BUSSAM then stated that Inv. Rodriguez had to tell him.

k.    Inv. Rodriguez said he could tell AL BUSSAM any reason, and AL BUSSAM responded "anything that you can come up with, you know . . .." Inv. Rodriguez stated "I can say whatever reason . . .," then asked AL BUSSAM what was a good reason to take Percoset or Dilaudid.

l.    AL BUSSAM then asked if Inv. Rodriguez was addicted to heroin, to which Inv. Rodriguez responded "not that

50

I know of." Subsequently, AL BUSSAM asked how long Inv. Rodriguez had been taking OxyContin, and Inv. Rodriguez responded "on an off for the last, say, five years." AL BUSSAM asked, "Really?" Inv. Rodriguez stated that he used it for a while, but stopped. AL BUSSAM asked if Inv. Rodriguez had a reaction when he stopped. Inv. Rodriguez replied "a little, but then I used something else, like Vicodin or Dilaudid."

       m.    AL BUSSAM then asked Inv. Rodriguez what he did for a living, to which he responded delivering supplies to construction sites. AL BUSSAM asked if there was a lot of lifting. Inv. Rodriguez answered, "No, not really," and that he uses dollies. AL BUSSAM also asked if Inv. Rodriguez was involved in an auto accident, if he had insomnia, or if he had a cough. To each question posed, Inv. Rodriguez responded in the negative. However, he admitted to "sometimes" having trouble falling asleep.

       n.    After each response, AL BUSSAM paused for an extended period of time to write in Inv. Rodriguez's chart. Inv. Rodriguez then told AL BUSSAM his friend "Chris" said AL BUSSAM was "cool." AL BUSSAM asked Inv. Rodriguez if anything was wrong with his health, other than what they had just discussed. Before Inv. Rodriguez had a chance to respond, AL BUSSAM asked about Inv. Rodriguez's smoking habits. Inv.

Rodriguez stated that he smoked about a pack of cigarettes per week.

o.   AL BUSSAM asked what type of work Inv. Rodriguez did in Texas before moving back to California.   Inv. Rodriguez replied, "[t]he same thing."

p.   At that point, the visit was interrupted by an unrelated telephone call, where AL BUSSAM briefly stepped into the hallway.   When the "medical examination" continued, AL BUSSAM proceeded to ask Inv. Rodriguez about his personal history and background (i.e., was he was single, did he have siblings/children, etc.), while AL BUSSAM noted the information Inv. Rodriguez's chart.

q.   Inv. Rodriguez told AL BUSSAM he "just" needed "something" because he was a "little stressed out."

r.   AL BUSSAM told Inv. Rodriguez if he ever decided to stop taking all of the medications and wanted help, his office would be happy to do that.   He then told Inv. Rodriguez about Suboxone that would help prevent the craving for the prescription medications.   Inv. Rodriguez said he had never heard of Suboxone.

s.     AL BUSSAM explained that Inv. Rodriguez did not need to be dependent on medications, to which Inv. Rodriguez replied that he did not think he was dependent on them.  Before Inv. Rodriguez could finish, he was interrupted by AL BUSSAM, who stated, "Oh, you are."  AL BUSSAM then told Inv. Rodriguez he was taking medications for "recreational purposes."  Inv. Rodriguez replied that he took the prescription medications to relax, and once he started feeling better, he could stop taking them.

t.     Inv. Rodriguez also asked if he could get Percoset or Dilaudid, and AL BUSSAM stated that he would give him Percoset because he could not give Inv. Rodriguez both.  AL BUSSAM also asked if Inv. Rodriguez wanted Xanax and Soma, to which Inv. Rodriguez stated "yeah."

u.     Inv. Rodriguez asked again for "Oxy," but AL BUSSAM would not prescribe it.  AL BUSSAM concluded the visit by telling Inv. Rodriguez he would see him in a month and handed him the prescription.  During AL BUSSAM's "medical examination" of Inv. Rodriguez, the only physical contact he had with him was when AL BUSSAM momentarily monitored Inv. Rodriguez's heart and lungs.

v.    At approximately 4:22 p.m., Inv. Rodriguez exited AL BUSSAM's medical building and the undercover operation was terminated.  He later gave MBC Investigator Kimberly Wilson ("Inv. Wilson") the prescription for Percoset, Xanax, and Soma, and gave me the concealed recording device.

37.    After discussing the meeting with Inv. Rodriguez, and reviewing the recording, as well as reviewing Dr. Khalid's expert report, I believe that AL BUSSAM provided prescriptions to Inv. Rodriguez without medical necessity and, therefore, beyond legitimate medical practice.  My conclusion is based on my training and experience, and the following:

a.    When Inv. Rodriguez paid Ochoa for the visit, Ochoa explained that it would cost $100 for the follow-up visits, and then asked Inv. Rodriguez if he was going to get cough syrup.  Without even knowing why Inv. Rodriguez was at the office, Ochoa asked about cough syrup.  As delineated below in paragraphs 46-49, multiple drug seizures of "cough syrup" prescribed by AL BUSSAM have occurred in Texas, where the codeine cough syrup is highly trafficked.  AL BUSSAM is an internal medicine doctor and Inv. Rodriguez's reason for being at SUBJECT PREMISES-1 was unknown to Ochoa at that point.  Because Ochoa asked if he would receive cough syrup, I believe many patients receive cough syrup from AL BUSSAM.

b.    After an initial introduction, Inv. Rodriguez told AL BUSSAM his friend "Chris" informed Inv. Rodriguez that he could get a prescription from AL BUSSAM. Inv. Rodriguez also told AL BUSSAM that he took OxyContin in the past. Based on my training and experience, I believe that these statements should have been an immediate "red flag" to AL BUSSAM that Inv. Rodriguez was not at SUBJECT PREMISES-1 for any legitimate medical purpose. AL BUSSAM asked Inv. Rodriguez what was "wrong" with him, to which Inv. Rodriguez responded "nothing." This should have been another "red flag," but instead, AL BUSSAM asked Inv. Rodriguez if he had any pain. Inv. Rodriguez responded, "No, not really," which should have been a third "red flag" to AL BUSSAM.

c.    Based on my training and experience, I believe that at this point, a legitimate doctor would have terminated the examination and asked the patient to leave. However, without even discussing any type of injury or pain that Inv. Rodriguez might have been experiencing, AL BUSSAM asked Inv. Rodriguez if he is "interested" in obtaining a prescription for "Norco" or "Vicodin."

d.    When Inv. Rodriguez asked for Dilaudid, AL BUSSAM stated that he could give him that prescription, but that he needed some reason before doing so. Based on my training and

55

experience, I believe that AL BUSSAM was attempting to coach Inv. Rodriguez into providing a fictitious medical purpose, to justify the reasons for issuing the prescription.

e.   AL BUSSAM's attempt to legitimize the issuance of the prescription can be further seen later in the recording when he prompts Inv. Rodriguez to state that he has a backache, an injured back, or a body injury, "so we have [] a reason for you to take Dilaudid, you know?"  When Inv. Rodriguez responded by saying that AL BUSSAM could "say whatever," I believe AL BUSSAM understood that Inv. Rodriguez did not have a legitimate medical need for the drugs.

f.   Without ever deciphering the source of Inv. Rodriguez's "pain," AL BUSSAM proceeded to ask what Inv. Rodriguez did for a living and whether he was in any automobile accidents.  Again, based on my training and experience, I believe he was "fishing" for a reason Inv. Rodriguez might need pain medication.

g.   As stated above, some of the pharmacists' complaints include patients with "chronic back pain."  Based on that information, as well as my review of the recording, where AL BUSSAM continuously pauses to write in Inv. Rodriguez's medical chart, I believe that Inv. Rodriguez's chart may reflect

56

a fictitious justification for the prescription AL BUSSAM ultimately wrote Inv. Rodriguez. For instance, based on the questions asked, AL BUSSAM may have listed that Inv. Rodriguez had a "backache" or "back pain" as a result of his employment.

h. During the questioning about the source of Inv. Rodriguez's pain, when Inv. Rodriguez told AL BUSSAM that Dilaudid made him feel good, AL BUSSAM laughed and stated, "Yeah, everybody tells me the same thing, you know?" Based on my training and experience, I believe that AL BUSSAM was indirectly referring to the "high" that AL BUSSAM's patients get from taking pain medication. AL BUSSAM's response is clearly not that of a doctor operating within legitimate medical practice.

i. Near the end of AL BUSSAM's "medical examination" of Inv. Rodriguez, AL BUSSAM told Inv. Rodriguez that he could take Suboxone if he wanted to stop being "dependent" on medications such as Dilaudid. When Inv. Rodriguez stated that he did not think he was dependent on Dilaudid, AL BUSSAM quickly stated, "Oh, you are." AL BUSSAM also stated that he knew Inv. Rodriguez was taking drugs for "recreational use." I believe this to mean that AL BUSSAM recognizes Inv. Rodriguez as a drug addict, since he specifically told Inv. Rodriguez that he is "dependent" on pain medication and used it recreationally.

j.    Despite the fact that AL BUSSAM was willing to prescribe pain medication to a patient he believed to be dependent on it, AL BUSSAM told Inv. Rodriguez that he was only willing to prescribe Percoset or Dilaudid, but not both.  Based on my training and experience, as well as AL BUSSAM's prior statements to SA Johnson about the "controversy" surrounding OxyContin, I believe AL BUSSAM understands that a prescription for both Percoset and Dilaudid - highly addictive Schedule II pain medications - from the same patient-visit (and on the same script) would be highly suspicious to a pharmacist filling the prescription and possibly to an enforcement officer's review of CURES.

k.    After AL BUSSAM agreed to prescribe Inv. Rodriguez Percoset, AL BUSSAM immediately asked Inv. Rodriguez if he would like Xanax.  When Inv. Rodriguez agreed, AL BUSSAM also asked if he would like Soma, and prescribed that as well. Inv. Rodriguez never mentioned suffering from anxiety or taking anti-anxiety medication in the past.

<u>Undercover Purchase of Prescription for Percoset, Xanax, and Soma Tablets on July 2, 2009</u>

38.    On July 2, 2009, Inv. Rodriguez went into SUBJECT PREMISES-1 in an undercover capacity.  Inv. Rodriguez wore a recording device, which, due to technical problems, did not

capture the actual meeting between Inv. Rodriguez and AL BUSSAM. The recording device only captured what occurred prior to the "medical examination" in SUBJECT PREMISES-1. Inv. Rodriguez met with AL BUSSAM. During the meeting, AL BUSSAM asked Inv. Rodriguez about his purported back injury. As noted above, however, during Inv. Rodriguez's first visit on June 4, 2009, Inv. Rodriguez never mentioned any injury to any part of his body – despite AL BUSSAM's repeated attempts to prompt Inv. Rodriguez into specifying a source of pain.[4] Even though Inv. Rodriguez stated that his back was "fine" during this visit, AL BUSSAM prescribed Inv. Rodriquez 150 Percoset 10/325mg tablets, 100 Xanax 2mg tablets, and 100 Soma 350mg tablets with no medical necessity or examination.

### Undercover Purchase of Prescription for Dilaudid, Xanax, and Soma Tablets on March 25, 2010

39.  Approximately eight months elapsed before another undercover operation occurred at SUBJECT PREMISES-1. When Inv. Rodriquez called to make an appointment with AL BUSSAM, he was informed that AL BUSSAM's office moved from Suite #503 to Suite #403. On March 25, 2010, Inv. Rodriquez returned to SUBJECT

---

[4] Based on my review of the June 4, 2009 recording, where AL BUSSAM continuously wrote notes in Inv. Rodriguez's patient file, I believe AL BUSSAM concocted a fictitious back injury in Inv. Rodriguez is patient chart to legitimize the patient's visit and need for a prescription.

PREMISES-1 (Suite #403).  Inv. Rodriguez wore a recording device.  As detailed below, Inv. Rodriguez met with AL BUSSAM and received a prescription for 120 Dilaudid 4mg tablets, 100 Xanax 2mg tablets, and 100 Soma 350mg tablets with no medical necessity or examination.  After reading Inv. Rodriguez's report of the undercover buy, reviewing the recording, and speaking with Inv. Rodriguez, I learned the following:

    a.   At approximately 4:12 p.m., Inv. Rodriguez walked into the medical building.

    b.   When Inv. Rodriguez arrived at the front door of SUBJECT PREMISES-1 (i.e., Suite #403), it was locked.  Inv. Rodriguez knocked on the door and Ochoa opened it.  Inv. Rodriguez told her that he had an appointment.  He was let in, then signed in at the reception desk and sat down.  After approximately five minutes, Inv. Rodriguez was weighed and placed in an examination room, where he waited.  Inv. Rodriguez told me that the new office appeared to be larger than the previous office.

    c.   Approximately 20 minutes later, AL BUSSAM entered the examination room and asked how Inv. Rodriguez was doing.  Inv. Rodriguez said that he was doing well and that he had just returned from Texas.  AL BUSSAM asked Inv. Rodriguez why he had

Case 2:10-cr-01260-SJO Document 1 Filed 10/19/10 Page 62 of 122 Page ID #:62

not seen Inv. Rodriguez in about a year. Inv. Rodriguez replied that he had to go back to Texas, but that he was back in California now.

       d.   AL BUSSAM asked if Inv. Rodriguez was there to get Percoset or something else. Inv. Rodriguez asked if he could get some "Oxy," but AL BUSSAM told him he could not give him "Oxy." AL BUSSAM asked if he wanted something stronger than Percoset, for instance, Dilaudid. Inv. Rodriguez replied that he would take Dilaudid. AL BUSSAM asked if Inv. Rodriguez wanted Xanax and Soma, to which he replied, "Yes." After writing in Inv. Rodriguez's medical file, AL BUSSAM gave Inv. Rodriguez the prescription and told him he would see him in a month.

       e.   At approximately 4:42 p.m., Inv. Rodriguez exited the building and the undercover operation was terminated. He later gave Inv. Wilson the prescription for Dilaudid, Xanax, and Soma, and he gave me the concealed recording device.

   40.  After later discussing the meeting with Inv. Rodriguez, reviewing the recording and his report, I believe that AL BUSSAM prescribed medication to Inv. Rodriguez without medical necessity and, therefore, beyond legitimate medical

practice.  Based on my training and experience, I believe that
due to the following:

a.    Approximately eight months had elapsed since Inv.
Rodriguez visited SUBJECT PREMISES-1 and his "medical
examination" was only approximately four minutes long.  A
majority of the four minutes consisted of AL BUSSAM writing in
Inv. Rodriguez's medical file.  I believe AL BUSSAM may have
been writing his fictitious reasons for issuing the
prescription.

b.    Based on SA Johnson's and Inv. Rodriguez's
previous visits at the old office, where the waiting room was
full, I believe AL BUSSAM moved to a larger office so that he
could accommodate more "patients."  AL BUSSAM's ability to
"examine" more patients is directly correlated with his ability
to make more money.

c.    During the "medical examination" of Inv.
Rodriguez, the only time AL BUSSAM ever asked about Inv.
Rodriguez's health was when he walked into the room and asked
Inv. Rodriguez how he was feeling.  Despite acknowledging the
fact that almost a year had passed since Inv. Rodriguez's last
visit, Inv. Rodriguez was never given a pain assessment or
physically touched by AL BUSSAM.  AL BUSSAM was in the

62

examination room for less than one minute when he asked Inv. Rodriguez if he wanted to "stay" with the Percoset or if he wanted something else.

d.   Even though AL BUSSAM would not prescribe OxyContin, AL BUSSAM was quick to offer a prescription for Dilaudid, a drug AL BUSSAM referred to as "stronger" than Percoset.   When Inv. Rodriguez agreed to the Dilaudid prescription, AL BUSSAM immediately asked if he wanted Xanax and Soma.   AL BUSSAM did not discuss pain, any ailments or injuries, anxiety, or the need for a muscle relaxer.

e.   I believe this visit exhibited a blatant disregard for Inv. Rodriguez's health because he was not seen by AL BUSSAM in several months and he did not verify or even ask what pain medications he had been taking while in Texas. Without discussing pain once, AL BUSSAM agreed to give Inv. Rodriguez a stronger pain medication.

<u>Undercover Purchase of Prescription for Percoset, Xanax, Soma, and Phenergan with Codeine on June 4, 2010</u>

41.   On June 3 and 4, 2010, SA Johnson and TFO Erin Grove ("TFO Grove") went into SUBJECT PREMISES-1 in an undercover capacity.   SA Johnson and TFO Grove each wore a recording device.   SA Johnson introduced TFO Grove to AL BUSSAM as his girlfriend.   TFO Grove made an attempt to be seen by AL BUSSAM

63

as a patient on these dates, but the office would not take "new patients" until January 2011.  TFO Grove was in the examination room with SA Johnson during his visit.  As detailed below, AL BUSSAM prescribed 150 Percoset 10/325mg tablets, 100 Xanax 2mg tablets, 100 Soma 350 mgtablets, and Phernergan with codeine, with no medical necessity or examination.  After reading SA Johnson's report of the undercover buy, watching the undercover recordings of the purchase, and speaking with SA Johnson and TFO Grove, I learned the following:

    a.   On June 3, 2010, at approximately 3:41 p.m., SA Johnson and TFO Grove entered the building where SUBJECT PREMISES-1 is located.  When they entered SUBJECT PREMISES-1, SA Johnson went to the front desk and said he wanted to get on "the list," referring to the waiting list for AL BUSSAM.  Ochoa asked SA Johnson if he had an appointment, and when he responded in the negative, she stated that he could not be seen because he did not have an appointment.  SA Johnson also asked Ochoa if his girlfriend could be seen, but because she was not a current patient, he was told AL BUSSAM would not see her until January 2011.  Ochoa told SA Johnson he could return on June 4, 2010.

    b.   At approximately 3:50 p.m., SA Johnson and TFO Grove exited the building.  The undercover operation was terminated, but surveillance on the medical building continued.

c.    At approximately 7:03 p.m., I observed two females, one of whom was later identified as MENDOZA, exit the building with AL BUSSAM.  AL BUSSAM walked with the females to a vehicle registered to "Patrick Mendoza."  Then, the females drove away.  AL BUSSAM walked to LEXUS-1, placed a dark-colored briefcase into the back passenger's side, behind the driver's seat, of the vehicle, and entered the driver's side door.  He then departed the location and was followed to SUBJECT PREMISES-3, his residence.

d.    At approximately 7:47 p.m., SA Mark Nomady ("SA Nomady") observed AL BUSSAM arrive at SUBJECT PREMISES-3.  Prior to him arriving, SA Nomady observed that the garage door at the residence was closed.  When AL BUSSAM arrived at SUBJECT PREMISES-3, he parked LEXUS-1 in the garage to the left of a dark-colored sedan.  Surveillance was terminated.

e.    On June 4, 2010, at approximately 2:13 p.m., SA Johnson and TFO Grove entered the medical building where SUBJECT PREMISES-1 was located.

f.    At approximately 6:00 p.m., while in SUBJECT PREMISES-1, SA Johnson's vitals were taken, and he and TFO Grove were placed into an examination room.

65

g.   At approximately 6:05 p.m., AL BUSSAM entered the room and asked how SA Johnson was feeling and if he was still suffering from anxiety.  SA Johnson responded sarcastically that he was, due, in part, to the four hour wait at SUBJECT PREMISES-1.  AL BUSSAM wrote in SA Johnson's file and asked, "What would you like today?"

h.   SA Johnson stated that he wanted cough syrup.  AL BUSSAM responded that cough syrup was an additional prescription (from the previous prescriptions SA Johnson had received).  AL BUSSAM also asked if SA Johnson still wanted Percoset for "his thing," and if he wanted Xanax and Soma.  SA Johnson said yes and repeated that he wanted "cough syrup" several times.

i.   SA Johnson asked AL BUSSAM if he could conduct a "medical examination" of his girlfriend, referring to TFO Grove, who remained in the examination room.  AL BUSSAM stated that his office was too busy.  TFO Grove interjected and asked to be seen since she was already there.  AL BUSSAM repeated that he was too busy at the moment, but that she could make an appointment.  SA Johnson asked AL BUSSAM to tell his staff about AL BUSSAM's decision to accept TFO Grove as a new patient.  AL BUSSAM left the room and when he returned, he told TFO Grove she could come to SUBJECT PREMISES-1 on June 7, 2010.

66

j. After AL BUSSAM wrote in SA Johnson's chart, he handed SA Johnson two separate prescriptions.

k. At approximately 6:09 p.m., SA Johnson and TFO Grove exited the building and the undercover operation was terminated. SA Johnson later gave me a prescription for Percoset, Xanax, Soma, and a prescription for Phenergan with codeine, and SA Johnson and TFO Grove each gave me their concealed recording devices.

42. After later discussing the meeting with SA Johnson and TFO Grove, as well as reviewing the recordings, I believe that AL BUSSAM prescribed medication to SA Johnson without medical necessity and, therefore, beyond legitimate medical practice. Based on my training and experience, I believe that due to the following:

a. SA Johnson had not seen AL BUSSAM since May 27, 2009, yet AL BUSSAM did not ask about SA Johnson's health, what medications he had been taking the past year, or anything related to the gap in time since his last visit. As with previous visits, AL BUSSAM met with SA Johnson for a very brief period of time. During this visit, AL BUSSAM spent less than six minutes with SA Johnson, but he left the room for over one

minute at one point, and spent a significant amount of time
writing silently in SA Johnson's chart.

b.  SA Johnson was not given a physical examination
or asked about any pain.

c.  When SA Johnson asked for cough syrup several
times, AL BUSSAM only replied that his request was an
"additional" one.  He made no attempt to ask SA Johnson why he
wanted it, if he was suffering from any respiratory issues, etc.
AL BUSSAM also did not listen to SA Johnson's lungs or examine
his throat during this visit.

d.  During the "medical evaluation" of SA Johnson,
TFO Grove remained in the examination room and asked about being
"examined" herself.  AL BUSSAM did not inquire as to why she
needed to be examined by him.  Based on the office staffs'
comments the previous day about SUBJECT PREMISES-1 having too
many new patients, it would appear that AL BUSSAM did not have
time to see her.  However, after immediately instructing his
staff to schedule an appointment for TFO Grove, an appointment
was put on calendar.  Based on my training and experience, I
believe that doctors like AL BUSSAM may attempt to keep a tight
control on the new patient traffic at their offices, in part, to
reduce their exposure to the potential risk associated with a

"new" patient. Once an "established" patient, like SA Johnson, has referred a potential "new patient," like TFO Grove, AL BUSSAM allowed for an appointment to be made.

e. Similarly, as with SA Johnson's previous visits, AL BUSSAM prescribed the "cocktail" of Schedule II, IV, and V controlled substances, "throwing in" the muscle relaxer without ever discussing any need by SA Johnson.

### Undercover Purchase of Prescription for Dilaudid, Xanax, Soma, and Phenergan with Codeine on July 7, 2010

43. On or about June 5, 2010, TFO Grove called SUBJECT PREMISES-1 to reschedule her June 7, 2010 appointment. I instructed TFO Grove to attempt to reschedule her appointment at SUBJECT PREMISES-2, rather than SUBJECT PREMISES-1. When TFO Grove called SUBJECT PREMISES-1, Ochoa instructed TFO Grove to call SUBJECT PREMISES-2 to make an appointment there. TFO Grove subsequently called SUBJECT PREMISES-2 and spoke to Rosemary MENDOZA ("MENDOZA"), and scheduled an appointment for July 6, 2010 at the new location for SUBJECT PREMISES-2.

44. On July 6, 2010, TFO Grove and SA Johnson went to SUBJECT PREMISES-2 in an undercover capacity. TFO Grove and SA Johnson each wore a recording device. As detailed below, TFO Grove and SA Johnson did not meet with AL BUSSAM in person. Instead, TFO Grove and SA Johnson met with MENDOZA and PARK, and

were told to come back the following day to obtain the prescription. On July 7, 2010, TFO Grove received two prescriptions, signed by AL BUSSAM, from MENDOZA for 120 Dilaudid 4mg tablets, 100 Xanax 2mg tablets, 100 Soma 350mg tablets, and Phenergan with codeine with no medical necessity or examination. After reading TFO Grove's report of the undercover buy, reviewing the recordings, and speaking with TFO Grove and SA Johnson, I learned the following:

a.    At approximately 12:37 p.m., TFO Grove and SA Johnson walked into the medical building. TFO Grove and SA Johnson then walked into SUBJECT PREMISES-2.

b.    While seated, TFO Grove observed two unidentified males go into the back of the office together. Approximately five minutes later, one of the unidentified males (hereinafter "UM") came back into the waiting room. Later, another unidentified male opened the waiting room door, and approximately six individuals left the waiting room with him. TFO Grove, SA Johnson and the UM remained in the waiting room at SUBJECT PREMISES-2.

c.    MENDOZA asked TFO Grove her name and why she was there. MENDOZA asked if TFO Grove and SA Johnson were there to see "Dr. Khan" and TFO Grove responded that she was there to see

AL BUSSAM. MENDOZA asked if TFO Grove had been there before and TFO Grove said that she was a new patient. TFO Grove told MENDOZA that she had called the previous address for SUBJECT PREMISES-2, but was informed AL BUSSAM was moving to this new office and today was going to be his first day at SUBJECT PREMISES-2.

d.   MENDOZA asked how TFO Grove was referred to AL BUSSAM and she said through her boyfriend, "Chris Washington." TFO Grove also told MENDOZA that SUBJECT PREMISES-2 was closer to where she lived.

e.   MENDOZA asked TFO Grove if she knew how much she had to pay, and TFO Grove replied "$370."

f.   MENDOZA said she was going to call SUBJECT PREMISES-1 and verify that "Chris Washington" is a patient. MENDOZA asked to see identification and TFO Grove and SA Johnson handed MENDOZA their undercover California Drivers' Licenses. A copy of TFO Grove's driver's license, "Erin Dunn," was made and TFO Grove later saw it in her medical chart.

g.   MENDOZA handed TFO Grove paperwork to fill out. The paperwork consisted of biographical and background information. One sheet asked what medications she was currently

taking. TFO Grove left that portion blank. TFO Grove left the paperwork for MENDOZA at the window.

h. While TFO Grove and SA Johnson were waiting, TFO Grove observed a male who was seen earlier sitting at a desk in an office in the back leave. TFO Grove believed this to be Dr. Khan.

i. TFO Grove and SA Johnson waited to be called back to the examination room. While they waited, TFO Grove and SA Johnson spoke with individuals in the waiting room, including the UM. SA Johnson asked the UM if he was there to see AL BUSSAM, and the UM said no and that he had "received" his "papers" yesterday. The UM told TFO Grove and SA Johnson that AL BUSSAM was not at SUBJECT PREMISES-2, and that AL BUSSAM never comes to SUBJECT PREMESIS-2. The UM said that MENDOZA is here and that she takes the money and "it" (i.e., patient medical charts) to SUBJECT PREMISES-1. He also said that "patients" return the following day for their "paper" (i.e., prescriptions signed by AL BUSSAM).

j. The UM told TFO Grove and SA Johnson that AL BUSSAM used to go to the previous address for SUBJECT PREMISES-2, but that the UM had not seen AL BUSSAM at either address for SUBJECT PREMISES-2 in approximately one year. The UM told TFO

Grove and SA Johnson that when he went to the previous address for SUBJECT PREMISES-2, people in the waiting room would try to sell him whatever medications they had on them.

k. TFO Grove asked the UM if there were other doctors in SUBJECT PREMISES-2 and the UM said he thought so. He also said that any other doctor at SUBJECT PREMISES-2 would not be the "type" of doctor TFO Grove and SA Johnson were "looking for." The UM told TFO Grove and SA Johnson that he has been coming to AL BUSSAM for approximately two years, and that "patients" could pay to leave "extra" names and get prescriptions in those names. The UM said what was going on at SUBJECT PREMISES-2 was "illegal."

l. MENDOZA told TFO Grove that she could come back to an examination room. MENDOZA tried to say that SA Johnson had to stay in the waiting room, but TFO Grove said that it was okay if he accompanied her. MENDOZA led TFO Grove and SA Johnson into a back room. The back room had only three chairs, a desk and limited medical equipment. The was no examination table. PARK was waiting in that room.

m. SA Johnson asked if AL BUSSAM was at SUBJECT PREMISES-2 and PARK told SA Johnson that if he wanted to see AL BUSSAM, he would have to go to SUBJECT PREMISES-1. PARK told

73

TFO Grove and SA Johnson that he would "admit" TFO Grove. TFO
Grove believed this to mean that he would place her into the
filing system at SUBJECT PREMISES-2.

n.  PARK stated that he would fill out the paperwork
and AL BUSSAM would go over the notes and the "medical chart"
that PARK prepared.  After AL BUSSAM reviewed the chart, he
would write a prescription.  PARK told TFO Grove that he is a
"Social Worker by Probation" and that he does the "admissions"
at SUBJECT PREMISES-2.  PARK told TFO Grove that AL BUSSAM signs
the prescriptions, and AL BUSSAM is the one giving her the
medication.  PARK said that he only assists with the
"facilitation."  PARK told TFO Grove, "We are all employees of
AL BUSSAM."

o.  PARK asked TFO Grove if she knew how much she was
going to pay, and TFO Grove said that MENDOZA told her $370 when
TFO Grove initially made the appointment at SUBJECT PREMISES-2.
TFO Grove handed PARK $380 in cash of OAF.  PARK did not use a
cash register to make change.  Instead, he took out his wallet
and handed TFO Grove two $5 bills.  SA Johnson asked PARK if TFO
Grove could get what she "wanted," and PARK said he had to ask
what TFO Grove wanted first because if TFO Grove wanted
OxyContin, AL BUSSAM would not write her a prescription.  PARK
went on to say that AL BUSSAM would not write a prescription for

OxyContin for even $1,000 because AL BUSSAM's license is worth more to AL BUSSAM than $1,000.

p.   PARK asked what medication TFO Grove wanted.  He then took a pen and piece of paper and handed it to SA Johnson to fill out.  TFO Grove told SA Johnson she wanted Dilaudid, "the cough stuff," and whatever other medications SA Johnson was receiving from AL BUSSAM.  SA Johnson wrote down Percocet, Xanax, Soma, Dilaudid, and "OC" (i.e., OxyContin), but PARK crossed out "OC."  PARK also told SA Johnson, "no Soma."  PARK told SA Johnson that there were no "contradictory medications" on the list and that four medications were "enough" for one prescription.

q.   PARK had SA Johnson fill out the requested medications section, which TFO Grove previously left blank.

r.   PARK asked TFO Grove her height and weight and had her sign what appeared to be an agreement or waiver form for AL BUSSAM.  PARK asked TFO Grove why she wanted to see AL BUSSAM and what her medical problem was.  TFO Grove said she hurt her leg a couple of years ago.

s.   SA Johnson told PARK to put down whatever "sounded good" so TFO Grove could get the medication she wanted. PARK said he could not do that and continued to ask TFO Grove

75

what her "problem" was. TFO Grove pointed to her left thigh and said she hurt her leg a couple of years ago when she ran into something.

    t.   PARK asked TFO Grove if she rode motorcycles, and TFO Grove said she had been on one before, but that she does not ride them. PARK told SA Johnson to think of something that would help TFO Grove "come up" with an injury to support getting the medication he had previously written down.

    u.   SA Johnson suggested saying that TFO Grove fell down the stairs. PARK asked TFO Grove when she hurt her leg and TFO Grove said a couple of years ago. PARK said if the injury had occurred a couple of years ago, there would be no pain today.

    v.   PARK asked TFO Grove the location and date of the injury, and she replied that she did not know. PARK asked where she was walking and SA Johnson said the beach in Florida, but then SA Johnson changed his mind while he was laughing. PARK then said, "How can I do this?" He asked TFO Grove if she was a student or worked, and TFO Grove responded that she did not have a job.

    w.   PARK then asked SA Johnson to help him come up with a circumstance when someone would have pain in their left

thigh.  PARK suggested hiking long distances as a cause of her purported thigh injury, and the location that the injury occurred.  TFO Grove said that Griffith Park was close and that individuals hike there.  PARK wrote in TFO Grove's medical chart.

      x.    PARK asked TFO Grove when she went hiking, and TFO Grove asked if it needed to be recent, because she could say she went last week.  PARK told SA Johnson and TFO Grove, "No wonder Lucy [Ochoa] told you to come here."  TFO Grove sarcastically responded that PARK is good at writing.  TFO Grove implied that PARK would "create" what appeared to be a legitimate reason for the prescription when there was none.

      y.    SA Johnson asked PARK why all the paperwork had to be done.  SA Johnson said that this was not done at SUBJECT PREMISES-1.  PARK said an "inspector" might come and check the chart, which is why they have to put all the information in it.  PARK then continued to write in the chart.

      z.    PARK asked TFO Grove if she smoked cigarettes and she said, "no."  He also asked if she smoked marijuana, and TFO Grove responded "every once in a while."  PARK finished writing in TFO Grove's medical chart and took TFO Grove's blood pressure.

aa.   Near the end of the "examination," TFO Grove asked PARK if she could give him extra names and money to get more prescriptions.   PARK replied, "That does not happen here." PARK told TFO Grove to come back around 1:30 p.m. the next day, on July 7, 2010, to pick up her prescription.

bb.   SA Johnson asked if he could start coming to SUBJECT PREMISES-2.   PARK refused.   PARK went on to say that AL BUSSAM would not like it if SA Johnson switched offices.   PARK then told MENDOZA that SA Johnson wanted to become a patient at their office and MENDOZA said they would have to get his chart from SUBJECT PREMISES-1.

cc.   TFO Grove asked MENDOZA if her medical chart would stay at SUBJECT PREMISES-2, and MENDOZA said that it would.   MENDOZA had SA Johnson fill out a piece of paper asking SUBJECT PREMISES-1 to give his medical chart to MENDOZA.   TFO Grove asked how much money subsequent visits would cost, and MENDOZA said $160 each for TFO Grove and SA Johnson.

dd.   MENDOZA told TFO Grove and SA Johnson that AL BUSSAM comes to SUBJECT PREMISES-2 on Tuesdays and Thursdays. Subsequently, while seated in the room with PARK and SA Johnson, TFO Grove observed a door with a plaque that read, "Nazar Al Bussam Internal Medicine."   Despite the display, TFO Grove did

78

not see AL BUSSAM at SUBJECT PREMISES-2. (It should be noted that July 6, 2010 was a Tuesday, when AL BUSSAM should have been at SUBJECT PREMISES-2, according to MENDOZA.)

ee. At approximately 1:48 p.m., TFO Grove and SA Johnson exited the building. Surveillance was terminated. Both TFO Grove and SA Johnson turned over their respective recording devices to me.

ff. I later learned that on this date, at approximately 2:50 p.m., MENDOZA called TFO Grove and said that Dilaudid and Percocet are "too close" to the same medication and that TFO Grove was only going to be able to receive Dilaudid.

gg. The next day, on July 7, 2010, at approximately 2:00 p.m., TFO Grove walked into SUBJECT PREMISES-2. I later learned that when TFO Grove entered SUBJECT PREMISES-2, the waiting room was empty. TFO Grove approached the window and a younger unidentified female from the previous visit was at the desk. She said something in an unknown language (believed to be Tagalog). MENDOZA came out to the reception area.

hh. MENDOZA left the reception area and returned with two prescriptions in TFO Grove's undercover name. TFO Grove asked what was on the prescriptions and MENDOZA said one prescription was for Dilaudid and Xanax, and the other

79

prescription was "the syrup" (i.e., Phenergan with codeine) and an antibiotic. MENDOZA told TFO Grove there was an antibiotic on the prescription so she could get the cough syrup.

    ii. MENDOZA also told TFO Grove that SA Johnson called SUBJECT PREMISES-1 and that he could now be seen at SUBJECT PREMISES-2, but that his medical file would be kept at SUBJECT PREMISES-1. After speaking with SA Johnson, I learned that MENDOZA had lied to TFO Grove because SA Johnson never actually called any office regarding his medical file.

    jj. At approximately 2:10 p.m., TFO Grove exited the building. She handed me the prescriptions. The operation was subsequently terminated. It should be noted that TFO Grove was not fitted with a recording device while she picked up the prescriptions.

    45. When I later discussed the meeting with TFO Grove and SA Johnson, as well as reviewed the recordings, I believe that AL BUSSAM, MENDOZA and PARK provided controlled substance prescriptions to TFO Grove without medical necessity and, therefore, beyond legitimate medical practice. Based on my training and experience, I believe that due to the following:

    a. The comments made by the UM in the waiting room on July 6, 2010, and AL BUSSAM's comment to SA Johnson on April

20, 2009 about AL BUSSAM no longer working out of SUBJECT

PREMISES-2, along with seeing MENDOZA and AL BUSSAM exit SUBJECT

PREMISES-1 on June 4, 2010, led me to believe AL BUSSAM does not

see patients at SUBJECT PREMISES-2.  Rather, AL BUSSAM merely

writes prescriptions based on the "medical charts" that PARK or

other office employees create.  I therefore believe that MENDOZA

and PARK are co-conspirators with AL BUSSAM in the distribution

of illegal prescriptions.

b.   AL BUSSAM prescribed beyond legitimate medical

practice first and foremost because he never saw "patient" TFO

Grove.  TFO Grove only met with MENDOZA and PARK at SUBJECT

PREMISES-2.  Information about MENDOZA's and PARK's title,

medical education, and training are unknown.

c.   Before being seen, the UM told TFO Grove he had

not seen AL BUSSAM in approximately one year.  At the previous

location for SUBJECT PREMISES-2, other "patients" tried to sell

prescriptions they obtained from AL BUSSAM, according to the UM,

which indicates pharmaceuticals are diverted at SUBJECT

PREMISES-2.  The UM also used the word "illegal" when describing

what happens at SUBJECT PREMISES-2, and informed TFO Grove and

SA Johnson that if they paid to leave "extra" names (i.e., names

other than their own), AL BUSSAM would write prescriptions in

those names.  The UM is aware that this practice occurs at SUBJECT PREMISES-2 because he has left extra names in the past.

d.    When TFO Grove asked if there were other doctors working out of SUBJECT PREMISES-2, the UM said he believed so but not the "type" of doctors TFO Grove and SA Johnson were "looking for."  I believe the UM is referring to AL BUSSAM being "dirty," and known to addicts (and those diverting prescriptions) as a doctor who prescribes without medical necessity.

e.    PARK "coached" and encouraged TFO Grove and SA Johnson to come up with an injury to justify the highly addictive controlled substances TFO Grove had requested.  PARK directly told TFO Grove and SA Johnson they had to "think of something" he could put in her medical chart.  He even directed many of his questions to SA Johnson, an "established" patient of AL BUSSAM, and gave SA Johnson a pen to fill out information about TFO Grove's supposed injury.  I believe PARK did so because he was aware SA Johnson "knows" how AL BUSSAM's offices operate (i.e., AL BUSSAM prescribes controlled substances without medical necessity).

f.    PARK was also aware that certain medications, when taken in combination with each other, may appear to

82

"inspectors" as a "red flag."   PARK attempted to thwart a

potential investigation or inspection by law enforcement of AL

BUSSAM's "illegal" activities by crossing out TFO's request for

"OC" and "Soma," and acknowledging that "contradictory

medications" did not remain on the list.

g.   A legitimate medical practice would not allow a

patient who leaves a portion of his or her paperwork blank to

have that section filled out by another patient. PARK did

exactly that when PARK gave SA Johnson a pen and instructed him

to fill out TFO Grove's information regarding her current

medications.

h.   When TFO Grove picked up her prescription the

following day, MENDOZA told her that an antibiotic was added to

justify the Phenergan with codeine prescription.   This

corroborates Ralph's Pharmacist OK's complaint that patients of

AL BUSSAM would not fill antibiotics when prescribed cough

syrup.

i.   At no time was TFO Grove physically touched,

other than having her blood pressure taken.   This, in

conjunction with the fact that AL BUSSAM never met with TFO

Grove before writing her a prescription for a highly addictive

83

pain medication, indicates that AL BUSSAM is prescribing pain medication without legitimate medical reasons.

I.    Arrests, Prosecutions, and Seizures Related to AL BUSSAM's Patients

46.   During the investigation of this case, I have learned that several of AL BUSSAM's patients have been arrested and prosecuted both locally and by out-of-state law enforcement for the sale of controlled substances prescribed by AL BUSSAM.

47.   On September 16, 2008, I arrested Willie Bates ("Bates") and Henderson Harris ("Harris") in an unrelated case. Bates and Harris were street sellers of controlled substances, such as OxyContin and Dilaudid, among other drugs. According to the CURES reports, and according to the defendants' own statements, both were "patients" of AL BUSSAM. Bates and Harris admitted to obtaining prescriptions for controlled substances from AL BUSSAM, as both "patients" and as "recruiters." They also admitted to selling the prescriptions illegally. Additionally, during the investigation of Bates and Harris, Bates sold SA Johnson OxyContin while SA Johnson was acting in an undercover capacity.

48.   On June 16, 2009, Shalonda McNeal ("McNeal") and Crystal Shoaf ("Shoaf") were arrested in Conway, Texas, by Texas State Troopers for transporting prescription narcotics, some of

which were prescribed by AL BUSSAM.[5]  Specifically, 20 one-pint

bottles of promethazine with codeine, 20 bottles of hydrocodone,

19 bottles of alprazolam, and less than two ounces of marijuana

were seized.  The bottles of promethazine with codeine and

alprazolam seized were prescribed by AL BUSSAM in various

"patients'" names.[6]  Therefore, I believe that McNeal and Shoaf

were traveling to Texas to sell the pharmaceuticals prescribed

by AL BUSSAM illegally.

49.  In addition to the above mentioned Texas seizure, I am

aware of other out-of-state hydrocodone and promethazine with

codeine seizures in which AL BUSSAM was the prescribing

physician.  For instance, on February 1, 2010, Border Patrol

agents in Sierra Blanca, Texas, seized promethazine with codeine

with AL BUSSAM's name on some of the bottles.  Three arrests

---

[5] MCNEAL, who was charged and convicted of transportation/sale of
a controlled substance in 2003, is listed on CURES reports as
being a patient of AL BUSSAM.

[6] Based on my training and experience, both from my own
investigations involving the transport and sale of Phenergan
with codeine and/or promethazine with codeine, as well as from
numerous agents/investigators in Texas, I know there is a high
demand for prescription cough syrup in the Houston, Texas, area.
By comparison, promethazine with codeine sells for $300 to $500
per one-pint bottle in Houston, Texas, but can be purchased in
Downey, California, pharmacies - near SUBJECT PREMISES-1 - for
approximately $48 to $65 per bottle.  Therefore, the re-sale in
Texas would yield an extremely high profit.

were made due to that seizure. On February 11, 2010, Texas Highway Patrol, near Alpine, Texas, stopped a vehicle with California license plates and found 93 one-pint bottles of promethazine with codeine, many of which had AL BUSSAM's name on them. Three arrests were made due to that seizure. On July 26, 2010, Border Patrol agents in Sierra Blanca, Texas, stopped a Greyhound bus during a routine check. Seven bottles of hydrocodone, containing a total of 335 tablets, along with six bottles of promethazine with codeine, were seized. Each of the bottles was prescribed by AL BUSSAM. One arrest was made due to that seizure.

J. **Medical Expert Opinion Concerning AL BUSSAM's Unlawful Practice of Medicine**

50. Shafi Khalid, M.D., is a Board-certified Family Practice physician and Chief Executive Officer/Medical Director of San Diego Pain Consultants, Incorporated. Dr. Khalid is also Board-certified in Pain Medicine, Geriatric Medicine, and Internal Medicine. Dr. Khalid currently operates his private practice in Poway, California, and has professional membership with the World Institute of Pain and American Society of Interventional Pain Physician, and maintains other well-respected professional associations.

51.   On January 15, 2009, at the request of the MBC, Dr. Khalid reviewed AL BUSSAM's CURES prescribing history for the period between September 1, 2008 and September 30, 2009.   Dr. Khalid also reviewed multiple DEA reports of interviews with pharmacists and reports of investigation concerning the undercover operations, as well as the corresponding recordings of those operations.   Additionally, Dr. Khalid reviewed copies of the prescriptions obtained during the undercover visits from January to July 2009, along with other DEA and MBC reports.   Dr. Khalid did not review the reports or recordings from the undercover operations in 2010.

52.   Dr. Khalid documented his review in a letter to MBC. He set forth his opinion concerning AL BUSSAM's prescribing activities, concluding that "[t]aken all together, the management of (undercover) Chris Washington [i.e., SA Johnson] and (undercover) Angel Balboa [i.e., Inv. Rodriguez] by Dr. Al Bussam with controlled substances represents an <u>extreme departure in standard of care</u>." (emphasis added).   Additionally, as described below in paragraphs 53 through 62, Dr. Khalid examined the undercover operations in 2009, and concluded that each individual undercover operation could be conservatively characterized as a "simple departure in the standard of care." Based on my conversations with Dr. Khalid and MBC Inv. Wilson, I

understand that the term "simple departure" to mean "the failure to use [a] level of skill, knowledge and care in diagnosis and treatment that other reasonably careful physicians would use in the same or similar circumstances." Similarly, I understand that the term "extreme departure" to mean "the want of even scant care." The terms "simple departure" and "extreme departure" are used exclusively by MBC to evaluate whether a physician has committed "unprofessional conduct" while working with his patients.

### AL BUSSAM Did Not Comply with the Standard of Care for Prescribing Controlled Substances to SA Johnson and Inv. Rodriguez

53. Upon reviewing SA Johnson's and Inv. Rodriguez's January 26, February 23, April 20, May 27, June 4, and July 2, 2009, undercover visits to SUBJECT PREMISES-1, Dr. Khalid concluded that AL BUSSAM fell below the standard of care for prescribing controlled substances in several areas. Specifically, Dr. Khalid's review of the reports and recordings resulted in an analysis of AL BUSSAM's multiple departures from standards of care in relation to SA Johnson's and Inv. Rodriguez's undercover operations.

54. Dr. Khalid also concluded that AL BUSSAM fell below the standard of care for medical history and physical

examination.  Based on my review of his letter to MBC, I learned the following about medical history and physical examination:

a.   The standard of care requires that a medical history and physical examination must be accomplished.  This includes an assessment of the pain, physical and psychological function; a substance abuse history; history of prior pain treatment; an assessment of underlying or coexisting diseases or conditions; and documentation of the presence of a recognized medical indication for the use of a controlled substance.  In continuing care situations for chronic pain management, the physician and surgeon should have a more extensive evaluation of the history, past treatment, diagnostic tests, and physical exam.

b.   The medical history obtained by AL BUSSAM indicated that SA Johnson had no current pain complaints and clearly exhibited a drug-seeking behavior.  SA Johnson admitted his current and past abuse of various controlled substances.  AL BUSSSAM did not confirm medical indications for use of controlled substances either by medical history or physical examination.  Instead, AL BUSSAM suggested that SA Johnson come up with some appropriate symptoms that justify prescription of controlled substances.

89

c.   The medical history obtained by AL BUSSAM indicated that Inv. Rodriquez has no current pain complaints. Inv. Rodriguez stated he takes the medication for pleasure and clearly exhibited a drug-seeking behavior.  Inv. Rodriguez also admitted his current and past abuse of various controlled substances to AL BUSSAM.  The recorded encounter shows AL BUSSAM did not confirm a medical indication for use of controlled substance either by medical history or physical examination. Instead, he suggested Inv. Rodriguez come up with some appropriate symptoms that would justify prescription of controlled substances.

d.   Dr. Khalid concluded that there were recurring simple departures in the standard of care in AL BUSSAM's failure to establish a recognized medical condition by medical history and physical examination for SA Johnson and Inv. Rodriquez.

55.  Dr. Khalid also concluded that AL BUSSAM fell below the standard of care for informed consent with SA Johnson and Inv. Rodriquez.  Based on my review of his letter to MBC, I learned the following about informed consent:

a.   The standard of care requires that a physician discuss risks and benefits of the use of controlled substances

and other treatment modalities with the patient, caregiver, or guardian.

b.   AL BUSSAM did not discuss risks or benefits of the use of controlled substances during initial or subsequent follow-up visits by SA Johnson and Inv. Rodriguez.

c.   Dr. Khalid concluded that there were recurring simple departures from standard of care when AL BUSSAM failed to discuss the medical risk and benefit of controlled substances with SA Johnson and Inv. Rodriguez.

56.   Dr. Khalid also concluded that AL BUSSAM fell below the standard of care for periodic review.   Based on my review of his letter to MBC, I learned the following about periodic review:

a.   The standard of care requires that the physician and surgeon should periodically review the course of pain treatment of the patient and any new information about the etiology of the pain or the patient's state of health. Continuation or modification of controlled substances for pain management therapy depends on the physician's evaluation of progress toward treatment objectives.   If the patient's progress is unsatisfactory, the physician and surgeon should assess the

appropriateness of continued use of the current treatment plan and consider the use of other therapeutic modalities.

b.    AL BUSSAM did not attempt to review the course of pain treatment prescribed by him, and never inquired regarding progress of SA Johnson and Inv. Rodriguez during follow up visits.

c.    Dr. Khalid concluded that there were multiple simple departures in the standard of care during the course of treatment of SA Johnson and Inv. Rodriquez for failure to perform a periodic review of pain control, and failure to establish appropriateness of continued treatment with controlled substances.

### AL BUSSAM Did Not Prescribe the Medication for an Appropriate and Legitimate Purpose to SA Johnson and Inv. Rodriquez

57.   Upon reviewing SA Johnson's and Inv. Rodriguez's January 26, February 23, April 20, May 27, June 4, and July 2, 2009, undercover visits to SUBJECT PREMISES-1, Dr. Khalid concluded that AL BUSSAM prescribed medicine excessively and without medical indication based, in part, on his analysis of the Business and Profession Code and his review of the reports and recordings.

92

58.   Specifically, Dr. Khalid concluded that AL BUSSAM prescribed medicine excessively under California Business and Profession Code § 725.   Based on my review of his letter to MBC, I learned the following about AL BUSSAM's excessive prescriptions under Section 725:

a.   The assessment as to whether prescribing for a particular patient was excessive involves the nature of the medical complaints and the amount and frequency of the prescription of drugs.   This can be a single drug, a class of drugs such as opiates or amphetamines, or a pattern of prescribing a large amount of drugs without justification.

b.   AL BUSSAM prescribed large amounts of multiple controlled substances to SA Johnson and Inv. Rodriquez, who did not complain of pain and have no recognized medical conditions determined by their medical history and physical examination.

c.   Dr. Khalid concluded that AL BUSSAM violated excessive prescribing under California Business and Profession Code § 725.

59.   Dr. Khalid also concluded that AL BUSSAM prescribed without medical indication under California Business and Profession Code § 2242.   Based on my review of his letter to

93

MBC, I learned the following about AL BUSSAM's prescribing without medical indication under § 2242:

a. It is unprofessional conduct to prescribe, dispense, or furnish dangerous drugs "without an appropriate prior examination and medical indication." This covers the situation where a physician simply prescribes a medication, usually a controlled substance, without any underlying pathology indicating a need for that medication. This also addresses the situation where a physician, knowing that a patient is addicted to dangerous drugs, continues to prescribe that drug.

b. AL BUSSAM repeatedly prescribed excessive amounts of controlled substances to SA Johnson and Inv. Rodriquez without any medical indications.

c. Dr. Khalid concluded that AL BUSSAM has violated prescribing without medical indication under Business and Profession Code § 2242 for both SA Johnson and Inv. Rodriquez.

### Dr. Khalid's Review of the CURES Reports

60. Dr. Khalid also reviewed AL BUSSAM's CURES reports from September 1, 2008 through September 30, 2009 at the request of investigators and was asked to pay special attention to certain patients. During his review, he observed that there

94

were a total of 3,192 pages in the report, which contained information about AL BUSSAM'S patients and prescriptions.

61. According to Dr. Khalid's report, there are 23,515 prescriptions for controlled substances filled by AL BUSSAM's patients at various pharmacies throughout Southern California. Dr. Khalid stated that a very high proportion of prescriptions were for hydrocodone, with various milligram doses. Dr. Khalid also noted that the most common combination during this time is the combination of alprazolam, prescribed with hydrocodone.

62. Dr. Khalid's report also discusses some of AL BUSSAM's patients, taking into account the number and types of their prescriptions, the amount of prescriptions filled, the locations that the prescriptions were filled, as well as the age of AL BUSSAM's patients, etc. Specifically, based on Dr. Khalid's letter to MBC, which summarizes information in CURES, I learned the following:

a. There are a large number of AL BUSSAM patients who filled various combinations of controlled substances, often multiple times, using multiple pharmacies.

b. All patients have filled controlled substances with high addictive potential.

c.   Some of the patients are of relatively younger age.   There are patients who have used different names (i.e., variations of spelling) to fill their prescription of controlled substance from different pharmacies.

d.   Dr. Khalid noted that he was very concerned about a pattern of and combinations of such controlled substances being prescribed to a large number of patients in what appears to be AL BUSSAM's solo and part-time practice.   However, he also noted that it is not clear from the CURES report if all prescriptions were written by AL BUSSAM himself, or if they were called in to pharmacies from his office or from other locations.

e.   Dr. Khalid also noted that, based on a review of CURES, it is not clear what medical conditions these patients have that may possibly justify such a dangerous practice of treatment with combinations of controlled substances.   After reviewing recorded encounters with SA Johnson and Inv. Rodriguez, Dr. Khalid stated that there are "grave concerns" that similar patterns exist with other patients.

K.   AL BUSSAM's Estimated Profit From Illegal Prescriptions

63.   I have learned by reading reports, reviewing recordings, and talking with the undercover agents and investigators during this investigation that AL BUSSAM charges

96

$200 for an initial visit/prescription and $100 for follow-up visits/prescriptions at SUBJECT PREMISES-1, and $370 for an initial visit/prescription and $160 for follow-up visits/prescriptions at SUBJECT PREMISES-2. During an interview with Inv. Wilson in December 2007, AL BUSSAM reported that he sees approximately 24 patients per day at SUBJECT PREMISES-1. Accounting for weekends when patients were not seen, he should have seen roughly 528 patients per month; conservatively earning $52,800 per month. This calculation only accounts for the follow-up visit fee of $100.

64. I have reviewed various CURES reports throughout this investigation. In October, November, and December 2007, the timeframe Inv. Wilson interviewed AL BUSSAM, I estimated that AL BUSSAM saw and, therefore, earned much more than reported. I calculated that AL BUSSAM saw approximately 930 patients each month, or earned approximately $93,000 per month. To determine how much money AL BUSSAM made during the course of this investigation, I randomly reviewed CURES for certain months, as shown below.

65. In October 2008, I estimated that AL BUSSAM saw over 1,100 patients, or made more than $110,000 in gross earnings that month. In June 2009, I estimated that AL BUSSAM again saw over 1,100 patients, or made more than $110,000 in gross

earnings that month.  In December 2009, I estimated that AL BUSSAM saw over 1,500 patients, or made more than $150,000 in gross earnings that month.  In April 2010, I estimated that AL BUSSAM saw over 1,300 patients, or made more than $130,000 in gross earnings that month.  In June 2010, I estimated that AL BUSSAM saw over 1,600 patients, or made more than $160,000 in gross earnings that month.  Except for the calculations in 2007, AL BUSSAM appears to have received over $100,000 in gross earnings per month, or over one million dollars in gross earnings per year.  Based on the entire investigation, I believe that a majority of this money was illegally obtained as proceeds of his prescription distributions.

66.  I arrived at the above calculations by counting the number of prescriptions filled by AL BUSSAM's patients in the particular month.  If one patient filled multiple prescriptions on the same day, they were counted only once, but if they filled multiple prescriptions within that month, they were counted the number of times they filled a prescription.  The formula used produces earnings estimates that are extremely conservative because it does not account for the patients who paid for an office visit to receive non-controlled substances prescriptions, such as muscle relaxants or antibiotics, or for Schedule V controlled substances not reported to BNE.  Additionally, since

I was unable to review individual prescriptions, this formula does not account for "patients" who visited AL BUSSAM several times per month that could have paid the follow-up visit fee and then $50 for refills. From CURES, there is no way to determine how much the patient paid at SUBJECT PREMISES-1 or SUBJECT PREMISES-2.

L. Information That AL BUSSAM Currently Resides at SUBJECT PREMISES-3

67. During this investigation, I learned the following information that indicates AL BUSSAM is currently residing at SUBJECT PREMISES-3:

a. On May 5, 2010, a check of public records for SUBJECT PREMISES-3 revealed that AL BUSSAM and his wife, Nazhat, purchased SUBJECT PREMISES-3 in 2003.

b. On September 3, 2009, I reviewed Southern California Edison records for SUBJECT PREMISES-3. These records show that AL BUSSAM is the current subscriber to the utilities at SUBJECT PREMISES-3.

c. On June 3, 2010, I and other agents/investigators conducted surveillance of SUBJECT PREMISES-1 and followed AL BUSSAM to SUBJECT PREMISES-3.

d.    LEXUS-1, AUDI-2, and MERCEDES-3 are registered to AL BUSSAM or his wife at SUBJECT PREMISES-3.

68.   Based upon my training and experience, I therefore believe that it is likely that evidence of AL BUSSAM's drug trafficking activities will be found at SUBJECT PREMISES-3 and/or inside the vehicles registered to him or his wife.

## IX.   ADDITIONAL PROCEDURES REGARDING THE REQUESTED PATIENT INFORMATION

69.   As noted above, my investigation centers on, but is not limited to, evidence indicating that AL BUSSAM, MENDOZA, and PARK are distributing prescriptions for controlled substances to patients from at least January 2009 to the present.  AL BUSSAM has issued these prescriptions outside the scope of professional practice.  Thus, it is likely that the requested search warrants will call for the seizure of active patient files.  To minimize disruption to any legitimate medical needs of patients, the government proposes the procedures outlined in Attachment C. The procedures provide that, upon written request from the patient, the government will provide a copy within 48 hours (excluding weekends and holidays) of any medical treatment information it has seized regarding that patient.

## X.   COMPUTER DATA

70. Based on my training and experience I know that
doctors and their employees routinely store information about
patients on computers, and on March 25, 2010, Inv. Rodriguez
observed a computer in the reception area of SUBJECT PREMISES-1.
Similarly, on July 6, 2010, TFO Grove observed a computer in the
reception area of SUBJECT PREMISES-2. As a result of this
practice and the specific observation of a computer at SUBJECT
PREMISES-1 and SUBJECT-PREMISES-2, I seek authority to seize and
examine any computers and electronic storage devices found at
SUBJECT PREMISES-1, SUBJECT-PREMISES-2, and SUBJECT-PREMISES-3.

71. As used below, the term "digital device" includes any
electronic system or device capable of storing and/or processing
data in digital form, including: central processing units;
laptop or notebook computers; personal digital assistants;
wireless communication devices such as telephone paging devices,
beepers, and mobile telephones; peripheral input/output devices
such as keyboards, printers, scanners, plotters, monitors, and
drives intended for removable media; related communications
devices such as modems, cables, and connections; storage media
such as hard disk drives, floppy disks, compact disks, magnetic
tapes used to store digital data (excluding analog tapes such as
VHS), memory chips; and security devices. Based on my
knowledge, training and experience, as well as information

related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of the premises, it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, software application or operating system that is being searched.

b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover hidden, erased, compressed, encrypted or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory

102

or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 gigabytes ("GB") of data are now commonplace in desktop computers.  Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 240 million pages of data, that, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 GB drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet.  Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a

file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.

        e.   Although some of the records called for by this warrant might be found in the form of user-generated documents

104

(such as word processor, picture, and movie files), digital

devices can contain other forms of electronic evidence as well.

In particular, records of how a digital device has been used,

what it has been used for, who has used it, and who has been

responsible for creating or maintaining records, documents,

programs, applications and materials contained on the digital

devices are, as described further in the attachments, called for

by this warrant. Those records will not always be found in

digital data that is neatly segregable from the hard drive image

as a whole. Digital data on the hard drive not currently

associated with any file can provide evidence of a file that was

once on the hard drive but has since been deleted or edited, or

of a deleted portion of a file (such as a paragraph that has

been deleted from a word processing file). Virtual memory paging

systems can leave digital data on the hard drive that show what

tasks and processes on the computer were recently used. Web

browsers, e-mail programs, and chat programs store configuration

data on the hard drive that can reveal information such as

online nicknames and passwords. Operating systems can record

additional data, such as the attachment of peripherals, the

attachment of USB flash storage devices, and the times the

computer was in use. Computer file systems can record data about

the dates files were created and the sequence in which they were

created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment.

f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment.

## XI. ITEMS TO BE SEIZED

72. Based on the information contained in this affidavit, I respectfully submit that there is probable cause to seize the following items, which constitute evidence of violations of

Title 21, United States Code, Sections 846 and 841(a)(1), from the SUBJECT PREMISES:

a. United States currency in an amount exceeding $1,000.

b. Any and all controlled substances, including, but not limited to, oxycodone, hydromorphone, hydrocodone, alprazolam, promethazine with codeine, and carisoprodol (in all forms, combinations, strengths, doses, and dosages, to include brand name and generic form).

c. For the time period January 2009 to present: Any and all documents of AL BUSSAM's that refer or relate to the price, quantity, and/or times when controlled substances, including oxycodone, hydromorphone, hydrocodone, alprazolam, promethazine with codeine, and carisoprodol, were requested, prescribed, obtained, transferred, sold, or purchased, including, but not limited to, invoices from pharmaceutical companies, ledgers, customer lists, appointment books, pharmacy information, correspondence, notations, logs, receipts, journals, books, and records.

d. For the time period January 2009 to present: Any and all medical records, patient files, sign-in sheets, charts, billing information, payment records, and identification

107

documents that refer to any patients of AL BUSSAM who were prescribed or dispensed controlled substances, including, but not limited to, oxycodone, hydromorphone, hydrocodone, alprazolam, promethazine with codeine, and carisoprodol by AL BUSSAM.

e.   For the time period January 2009 to present:  Any and all personal telephone and address books and listings, letters, cables, telegrams, emails, personal notes, and other items of AL BUSSAM's, MENDOZA's, or PARK's that refer or relate to the prescription, transfer, purchase, or sale of any controlled substance by AL BUSSAM.

f.   For the time period January 2009 to present:  Any and all financial records of AL BUSSAM's, MENDOZA's or PARK's showing payment, receipt, concealment, transfer, or movement of money relating to the prescription, transfer, purchase, sale, or concealment of any controlled substance by AL BUSSAM.

g.   For the time period January 2009 to present: Documents, including, but not limited to, emails, check registers, cancelled checks, deposit items, financial instruments, facsimile transmissions, or ledgers that refer to any person who was prescribed, provided with, or sold a controlled substance by AL BUSSAM, MENDOZA, or PARK.

h.    For the time period January 2009 to present: Memoranda concerning, correspondence with, and/or letters to or from any insurance company that refer to any person who was prescribed, provided with, or sold a controlled substance by AL BUSSAM, MENDOZA, or PARK.

i.    For the time period January 2009 to present: Records, documents, titles, mortgage paperwork, and deeds reflecting the purchase, rental, or lease of any real estate, and vehicles such as a car, truck, motorcycle, boat, plane, or RV by AL BUSSAM, MENDOZA, or PARK.

j.    Telephone paging devices, beepers, mobile telephones, car telephones, and other communication devices of AL BUSSAM, MENDOZA, or PARK.

k.    Firearms and related items, such as ammunition, holsters, gun cases, and firearm cleaning kits of AL BUSSAM, MENDOZA, or PARK.

l.    Indicia of occupancy, residency, rental, or ownership of SUBJECT PREMISES-1, SUBJECT PREMISES-2, or SUBJECT PREMISES-3, including, but not limited to, utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, and escrow documents.

m.    Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, conveyances, and/or other residences.

n.    As used above, the terms oxycodone, hydromorphone, hydrocodone, alprazolam, promethazine with codeine, and carisoprodol include all medications containing the drug including those marketed under brand names, e.g., Dilaudid, Percoset, Vicodin, Xanax, Phenergan with codeine, and Soma.

o.    With respect to any digital devices containing evidence falling within the scope of the foregoing search categories, records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show the actual user(s) of the digital device during the time period between January 2009 and October 2010 for SUBJECT PREMISES-1 and SUBJECT PREMISES-3, and between July and October 2010 for SUBJECT PREMISES-2.

73.    As used above in paragraphs 72(a)-(o), the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form, including in digital form on any digital device and any forensic copies thereof.  As used both above and below, the term digital device includes any electronic

110

system or device capable of storing and/or processing data in
digital form, including: central processing units; laptop or
notebook computers; personal digital assistants; wireless
communication devices such as telephone paging devices, beepers,
and mobile telephones; peripheral input/output devices such as
keyboards, printers, scanners, plotters, monitors, and drives
intended for removable media; related communications devices
such as modems, cables, and connections; storage media such as
hard disk drives, floppy disks, compact disks, magnetic tapes
used to store digital data (excluding analog tapes such as VHS),
and memory chips; and security devices.

74. In searching digital data stored on digital devices,
law enforcement personnel executing this search warrant will
employ the following procedure:

a. The physical search of the premises will be
conducted by law enforcement agents who are investigating the
crimes described in the affidavit (the "investigating agents").
Upon securing the premises, these investigating agents will, if
they can do so without reviewing the contents of the digital
data contained on any digital device, seek to determine if the
digital device contains data falling within the scope of the
items to be seized under this warrant. If, without reviewing
the contents of the digital data contained thereon, the

investigating agents can make the determination that a digital device contains data falling within the scope of the items to be seized under this warrant, that digital device will be seized. In attempting to determine whether any digital device contains data falling within the scope of the items to be seized as described in this subparagraph, the investigating agents will not review the digital contents of any such device or any indexes or summaries thereof.

b.    If the investigating agents conclude that they cannot make the determination that a digital device contains data falling within the scope of the items to be seized under this warrant without reviewing the contents of the digital data contained on the digital device, the investigating agents will consult with law enforcement personnel and/or others aiding law enforcement personnel and acting at their direction who are not involved in the investigation of the crimes described in the affidavit (the "filter team"). The filter team will include law enforcement personnel and/or others aiding law enforcement personnel and acting at their direction specially trained in searching, seizing, and segregating digital data (the "computer personnel"). The filter team will be consulted (either on-site or off-site) to determine whether the digital device can be searched on-site in a reasonable amount of time and without

112

jeopardizing the ability to preserve data contained on the digital device.

      c.   If the filter team determines that the digital device can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, it will be searched on-site only by members of the filter team in a forensically sound fashion that will permit the filter team to make an initial determination whether it is subject to seizure, and will be seized only if the search by the filter team reveals it to contain any data that falls within the list of items to be seized under this warrant.

      d.   If the filter team determines that the digital device cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, then the filter team will determine whether it is practical to create a forensically sound image of the data contained on the digital device during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve that data. If it is practical, and the digital device cannot be searched on site in a reasonable amount of time and without jeopardizing the ability to preserve data, the filter team will make a forensically sound image of the data contained on the device ("a forensic copy") during the execution of this search and shall

113

filter team will determine whether it is practical to create a forensically sound image of the data contained on the digital device during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve that data. If it is practical, and the digital device cannot be searched on site in a reasonable amount of time and without jeopardizing the ability to preserve data, the filter team will make a forensically sound image of the data contained on the device ("a forensic copy") during the execution of this search and shall retain the forensic copy rather than the digital device itself for further analysis. If the filter team determines it is not practical to perform an on-site search of the digital device or make an on-site forensic copy within a reasonable period of time and without jeopardizing the ability to preserve data, then the digital device will be retained and transported to an appropriate facility for review.

e. As explained in paragraphs 71(d) and (e), data falling within the items to be seized in this warrant may be resident in any portion of the digital device. Such data also may be in partial or incomplete form. As a consequence, in searching the digital device or the forensic copy, the filter team may examine all of the data contained in the digital device or the forensic copy capable of containing items to be seized as

114

to be seized under this warrant as set forth in greater detail in subparagraph (g) below.

f.    Following a seizure of a digital device pursuant to subparagraphs 74(a), (c), or (d) above, the filter team will examine the digital device or the forensic copy to extract and seize any data that falls within the list of items to be seized set forth herein.  The filter team will seize and retain only data that falls within the scope of the items to be seized set forth in this warrant.  Absent an additional warrant or further order of the Court, the filter team will not seize, whether as being in plain view or for any other reason, data that does not fall within the scope of the items to be seized under this warrant.

g.    In searching a digital device or a forensic copy, the filter team will only use search protocols specifically designed to identify items to be seized under this warrant. These search protocols may include the use of a hash value library to exclude normal operating system files that do not need to be searched.

h.    The filter team will not disclose to this affiant or any other investigating agent, or any Assistant United States Attorney involved in this investigation, any data contained on

the digital device other than that which is seized as falling

within the scope of the items to be seized under this warrant

except with prior Court authorization.  The filter team may

disclose to this affiant and any other investigating agent any

data contained on the digital device that is seized as being

within the scope of the items to be seized under this warrant

without further order of the Court.

      i.   The filter team will complete its search of the

digital device as soon as is practicable but not to exceed 60

days from the date of execution of the warrant.  If additional

time is needed, the government may seek an extension of this

time period from the Court within the original 60 day period

from the date of execution of the warrant.

      j.   If the search determines that the digital device

or the forensic copy does not contain any data falling within

the list of the items to be seized pursuant to this warrant, the

government will return the digital device and delete or destroy

all the forensic copies thereof.

      k.   If  (i) the search determines that the digital

device is itself an item to be seized or contains digital data

falling within the list of the items to be seized under this

warrant or (ii) the filter team believes there is an adequate

factual and legal basis other than the plain view doctrine upon which to retain the digital device itself (if outside the list of items to be seized under this warrant) or digital data contained on the device that is outside the list of the items to be seized under this warrant, the filter team may, prior to making the return described in subparagraph (l) below, seek from the Court an order authorizing the filter team to retain such digital device or digital data.  In the event that the government obtains such an order, the digital device or digital data retained pursuant to such an order shall be held by the filter team and, absent further order of the Court, shall not be disclosed to the investigating agents or any Assistant United States Attorney involved in the investigation.

1.    Separate from the search warrant return made by the investigating agents, the filter team will certify and make a return to the Court regarding the seizure of digital devices, forensic copies, and digital data.  Such return shall be made as soon as practicable but in any event no later than 14 days after the completion of the search described in subparagraph (f) above.  The return will contain the following: (i) a detailed listing of all digital data seized, retained, and disclosed to the investigating agents as falling within the list of the items to be seized under this warrant; (ii) a detailed listing of all

117

digital devices and digital data that the filter team has returned to the party from whom the devices and data were seized; (iii) copies of any court orders authorizing the filter team to seize and retain digital devices and digital data not falling within the list of the items to be seized under this warrant together with a detailed listing of all digital devices and digital data seized and retained pursuant to these court orders; and (iii) a certification that all other digital devices and digital data that the filter team have not been authorized to seize and retain have been destroyed or returned.

　　　　m.　At this time, the individuals believed to be the owners of the digital devices are suspected of a crime, and the procedures set forth above are tailored to protect the privacy interests of other parties who are not under suspicion of criminal wrongdoing.

　　75.　In order to search for data that is capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items, subject to the procedures set forth above:

　　　　a.　Any digital device capable of being used to commit, further or store evidence of the offense listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding or storage of digital data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices and optical scanners;

c.   Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones and personal digital assistants;

d.   Any documentation, operating logs and reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters and other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

119

g.   Any passwords, password files, test keys, encryption codes or other information necessary to access the digital device or data stored on the digital device.

76.   The special procedures relating to digital media found in this warrant govern only the search of digital media pursuant to the authority conferred by this warrant and do not apply to any search of digital media pursuant to any other court order.

## XII. CONCLUSION

77.   Based on the foregoing, and on my training and experience, I believe that probable cause exists to believe that AL BUSSAM, MENDOZA, and PARK have conspired to violated Title 21, United States Code, Sections 846 and 841(a)(1) Conspiracy and Unlawful Distribution of Controlled Substances.

78.   Based on the foregoing, I believe that probable cause exists to believe evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 846 and 841(a)(1): Conspiracy and Unlawful Distribution of Controlled Substances, as set forth in Attachment B, are being maintained

///

///

120

at SUBJECT PREMISES-1, SUBJECT PREMISES-2, and SUBJECT

PREMISES-3, as set forth in Attachment A(1), A(2), and A(3),

respectively.

Kelly Webster
DEA Special Agent


Subscribed and sworn to before me
on this 1ˢᵗ day of October, 2010


United States Magistrate Judge Olguin

121